## CUNNINGHAM *v.* THE A. S. ABELL COMPANY

[No. 188, September Term, 1971.]

*Decided March 8, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Robert J. Thieblot,* with whom were *Donald C. Allen, John D. Alexander, Jr.,* and *Allen, Thieblot & Alexander* on the brief, for appellant.

*Benjamin R. Civiletti* and *Edmund P. Dandridge, Jr.,* with whom were *Robert G. Smith* and *Venable, Baetjer & Howard* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

Matthew S. Cunningham, appellant, formerly a Baltimore Sun newspaper home delivery carrier, sued The A. S. Abell Company, appellee, publisher of the Sunpapers, in the Circuit Court for Baltimore County for actual and punitive damages for breach of the contract between him and Abell, for malicious interference with the contract relationship between him and some 900 subscribers on his route, and for conversion by Abell of Cunningham's paper route. At the close of Cunningham's case, Judge Menchine granted Abell's motion for a directed verdict on the breach of contract count and on the conversion counts. At the close of the entire case, Cunningham elected to go to the jury on count three, which charged malicious and illegal interference with the contractual relations between Cunningham and his customers. Abell moved for a directed verdict. The court reserved. The jury found for Cunningham in the amount of $37,500 compensatory damage, allowing no punitive damages. Thereafter, Judge Menchine granted Abell's motion for a judgment n.o.v. and entered judgment against Cunningham for costs. The appeal is from that judgment and the questions presented by Cunningham are whether the contractual arrangements between Cunningham and Abell entered into in 1961 were in violation of the Sherman Anti-Trust Act, whether a State court could award damages for breach of a contract that violated the Sherman Act, and whether the court's determination in granting the judgment n.o.v. on the ground that there was no evidence to support the jury's verdict on malicious interference with contracts was right or wrong.

In early 1968 Cunningham was one of some 120 route owners who delivered Sunpapers to home delivery subscribers, and a member of the Sun Route Owners' Association. Each route owner had signed an identical contract approved in 1922 by the Association and presented to Abell by the Carriers' Council, a small group of owners elected by the members of the Association "to represent the best interest of the carriers in negotiations and

discussions with the Sunpaper management." The Carriers' Council under the contract acquired the right to discuss with Abell all matters which affected the welfare of the Sun route owners and to recommend the wholesale and retail prices of papers and the enforcement of the territorial monopolies of the carriers. Other provisions of the contract put a floor under the gross profit or margin of each carrier in relation to the retail price of the papers, thus fixing a maximum wholesale price in relation to the retail price, and Abell was required to recognize and give protection to the monopoly which each carrier had in his territory by virtue of horizontal agreement among them.

Cunningham first became a Sun carrier in 1961 when he bought a portion of a route in the Govans area of Baltimore. In 1966 he sold the Govans route to his father and he bought the Ruxton part of the Riderwood-Ruxton route owned and serviced by William P. Gill. The decision to subdivide the route was made by Gill and he set the territory in which Cunningham could serve papers. He also set the price, $4,000, and received all of it. The transfer was accomplished by assignment from Gill to Cunningham of "the privilege of serving the Sun, Morning, Evening and Sunday," in a specifically described geographical area. Abell noted its approval of the transfer on the assignment. The standard contract between Cunningham and Abell, signed in 1961, remained in effect.

On March 4, 1968 the Supreme Court decided the case of *Albrecht v. The Herald Co.,* 390 U. S. 145, 19 L.Ed.2d 998, in which it held that in the context of an arrangement somewhat similar to that here involved, there was a combination to fix maximum prices for the resale of the St. Louis Globe-Democrat that constituted, per se, an illegal restraint of trade under Section 1 of the Sherman Act. In the light of *Albrecht* (and prior decisions) Abell caused its relations with its carriers to be reviewed by counsel and was advised, and concluded, that the provisions for the fixing of wholesale prices in relation to retail prices, the requirements for bargaining between

Abell and the carriers as a group for the fixing of wholesale and retail prices and terms, and the agreement of Abell to support and protect the carriers' horizontal division of territories were so interwoven and interdependent as to make the existing contractual arrangements invalid.

By letter of March 29, 1968 Abell notified each carrier of this conclusion and declared his contract terminated. In the same letter Abell said:

> "We believe that we can legally no longer deal concertedly with all Route Owners together, through the Carriers' Council as their joint representative, or otherwise, but that we must deal with each Route owner independently.

> "Pending preparation and execution of a new contract between us, we expect to continue to sell you our newspapers in accordance with a schedule of prices, discounts and allowances which will be the same as that in the arrangement between us hereby terminated. We will expect you, during this period, to provide proper service, make prompt payment of your paper bills and provide the necessary ABC reports."

On April 19, 1968 Abell sent to Cunningham a form it proposed as a new contract. Cunningham ignored the communication. In May 1968 Abell increased the wholesale price of its papers, abolished the combination credit set by the old contract and reduced the spread between the wholesale price and the suggested retail price below that of the old contract. Cunningham paid the bills rendered him on the new basis by Abell, without comment or remonstrance.

The events which led to the present case include these: In early June, Cunningham had mailed F. Lee Goodwin, a Sunpaper subscriber for twenty-eight years, his bill for Morning, Evening and Sunday papers delivered in May and June. A check came back with a deduction (some

sixty-five cents) for wet and unreadable papers. Cunningham ignored the deduction. In August he mailed Mr. Goodwin a bill for July and August for $9.50, and again the return check reflected a deduction of thirty cents for wet and unreadable papers. Cunningham thereupon discontinued service to the Goodwin home, writing:

> "Since my service is not to your liking, please pick your papers up over at the store from now on.
>
> "You pay only six cents for the paper what more do you want.
>
> M L Cunningham"

Mr. Goodwin forwarded this declaration of independence to Abell's circulation manager.

Several days later Cunningham received from Charles Owens payment for his bill for July and August with a deduction of twenty-five cents for wet and missing papers. Owens had previously complained at least twice. Again irked, Cunningham wrote Owens:

> "Since you cannot receive the newspapers when I deliver them please pick them up over at the store from now on."

Enter now two other actors, Mr. and Mrs. Helmig. They deducted thirty-five cents from Cunningham's July and August bill for wet and missing papers. Cunningham cancelled the Helmigs' service with a curt note similar to the first two.

Although Cunningham testified that his obligation was to supply subscribers with dry, readable papers at reasonable hours, his regular practice was to make deliveries from the seat of his motor vehicle as he drove it along one side of the street, using an ambidextrous free-throwing swing out of the appropriate window, apparently without regard to weather conditions.

As a result of the complaints of Goodwin, Owens (an automobile dealer who for years had placed substantial

advertising in the Sunpapers and who threatened to cease doing so), and Helmig, the circulation manager of Abell caused a subordinate, Lingg, to attempt to resolve the trouble. Lingg talked to Cunningham at least twice and reported to his supervisor that Cunningham persisted in refusing to serve the three complainants; that his refusal was because of their repeated complaints; that he intended to treat any other complainers in the same way, and that if his right to do so was questioned, his "legal" reason would be that they owed him money.

Cunningham's attitude and actions were deemed very serious (among other things, advertising rates and revenues of a newspaper depend on the number of certified subscribers). Becker, Abell's business manager, and Knapp, its home delivery manager, were consulted.

About the middle of September Knapp met Cunningham and impressed upon him that his refusal to serve customers was an extremely serious matter and urged him to work the matter out. Cunningham promised to give consideration to the request. Several days later, without having approached the customers in any way, Cunningham called Knapp and said he would not resume the service. Thereupon, Becker instructed the circulation department to deliver papers to Goodwin, Owens and Helmig, and this was done by an Abell employee, one Bandelin. The service began on October 1. A few days later a check showed that the service was satisfactory. On the early morning of October 9 (about 5:00 a.m.) just after Bandelin had delivered the Morning Sun to Goodwin's home, Cunningham pulled up and stopped in front of Bandelin's car. Bandelin said he was an Abell employee. Cunningham heatedly told Bandelin he had no right to deliver papers to Goodwin, that Goodwin owed him money, that it would be unhealthy for Bandelin to be in this area and that he was going to take the paper Bandelin had just delivered. He did take the paper. The verbal interchange was loud enough to awaken Goodwin, who saw Bandelin put the paper in the mailbox and saw

Cunningham take it from the mailbox and drive away with it. Bandelin reported the incident to his superior by telephone and then went to the Abell office and made a written report. When Becker learned of the report and a telephone call from Goodwin that confirmed it, he discussed the incident with Reynolds, who recommended that all sales to Cunningham be ended at once. Becker reluctantly agreed and directed that Cunningham be so notified. Knapp called Cunningham and arranged to meet him in the Abell office the next morning, October 11. Knapp was subpoenaed early on the morning of the 11th and Cunningham talked to Brown, a home delivery manager, who told Cunningham he was through because he had stolen a paper. Abell began deliveries to Cunningham's route customers with the Evening Sun of October 11.

We agree with Judge Menchine that Cunningham could not, as a matter of law, recover on his claim for breach of the written contract. The Supreme Court consistently has held that agreements, contracts and combinations are illegal per se (without proof as to their unreasonableness) where they are formed with the purpose of fixing prices or dividing exclusive territories among dealers competing in the sale of products they have purchased outright.[1] *Ethyl Gasoline Corp. v. U. S.*, 309 U. S. 436, 84 L. Ed. 852; *U. S. v. Socony-Vacuum Oil Co.*, 310 U. S. 150, 84 L. Ed. 1129; *Mandeville Is. Farms v. American C. S. Co.*, 334 U. S. 219, 92 L. Ed. 1328; *U. S. v. Arnold, Schwinn & Co.*, 388 U. S. 365, 18 L.Ed.2d 1249; *U. S. v. Sealy*, 388 U. S. 350, 18 L.Ed.2d 1238; *Albrecht v. The Herald Co.*, 390 U. S. 145, 19 L.Ed.2d 998 (*supra*). The combination of carriers in the case before us, including Cunningham, used the group of identical contracts, including Cunningham's, as the mechanism for concertedly limiting and fixing the market

---

1. Section 1 of the Sherman Act provides in pertinent part, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce * * * is declared to be illegal * * *" 15 U.S.C.A. § 1, 26 Stat. 209 (1890).

price of newspapers, thereby making every such contract illegal per se under Section 1 of the Sherman Act.[2]

This Court uniformly has held that where a contract is illegal under a statute which is for the protection of the public interest a party to the illegal contract cannot recover damages for its breach. *Thorpe v. Carte*, 252 Md. 523, and cases cited; *Patton v. Graves*, 244 Md. 528; *Schill v. Remington-Putnam Book Co.*, 182 Md. 153. In *Thorpe* (p. 529), we said:

> " 'Any bargain is illegal if either the formation or the performance thereof is prohibited by constitution or statute.' 2 Restatement *Contracts* § 580. Generally a party to an illegal bargain cannot recover either damages for its breach or, after rescission, the performance he had rendered or its value. 2 Restatement *Contracts* § 598." [3]

See also *Cohen v. Frey and Sons, Inc.*, 197 Md. 586, 599, where Judge Markell for the Court said:

> "The common law makes unenforceable, and the Sherman Act, 15 U.S.C.A., § 1-7, forbids, as

---

2. The carriers, including Cunningham, now seemingly concede, if not urge, that the pre-March 1968 contract was illegal. See A. S. Abell Company v. Chell, 412 F. 2d 712, in which Abell sought a declaration that the pre-March 1968 contracts were illegal and the carriers agreed that such a declaration should be made. The day before the case before us was filed, Cunningham sued Abell in the United States District Court for the District of Maryland (Civil Action 20477), in which he sought treble damages under the anti-trust laws of the United States, alleging that Abell's part in the price fixing was "a per se violation of the Anti-Trust Laws of the United States."

3. Comment a under § 598 says: "[T]he rule of public policy that forbids an action for damages for breach of such an agreement is not based on the impropriety of compelling the defendant to pay the damages. That in itself would generally be a desirable thing. When relief is denied it is because the plaintiff is a wrongdoer, and to such a person the law denies relief. Courts do not wish to aid a man who founds his cause of action upon his own immoral or illegal act. If from the plaintiff's own statement or otherwise it appears that the bargain forming the basis of the action is opposed to public policy or transgresses statutory prohibitions, the courts ordinarily give him no assistance. The court's refusal is not for the sake of the defendant, but because it will not aid such a plaintiff."

tending toward monopoly and prevention of competition, all combinations and agreements to fix prices."

Cunningham's contention that there were facts in evidence that permitted a jury to find that Abell maliciously interfered with the 900 contracts between him and his customers is controlled by § 762 of the Restatement *Torts,* which provides that regardless of motive one who causes intended or unintended harm to another merely by refusing to continue a business relationship terminable at will is not liable for that harm.

Judge Menchine found, entirely correctly we think, that after the letter of March 29, 1968 the "subsequent relationship between Abell and Cunningham continued under the loosest possible ties as a contract terminable at the will of either." This being so, Abell was free to sell papers to Cunningham or to refuse to sell to him. See *Knocke v. Standard Oil Co.,* 138 Md. 278. Cunningham suggests that the real reason Abell ended its sales to him was that in September he had increased his retail prices above those suggested by Abell; that Abell intended to punish him for the price increase or to warn other carriers, or both, and therefore the termination of sales to him was within the exception in § 762 of the Restatement that the exemption from liability for refusal to continue dealings does not apply "if the refusal * * * is (b) a means of accomplishing an illegal effect on competition." Judge Menchine's finding of fact on the point was "there is simply no evidence to support the contention * * * there is nothing that rises above mere guess or speculation that indicated Abell terminated its relationship with Cunningham for reasons ante-dating the [newspaper stealing] incident of October 9, 1968 * * * although no reason is required for the termination of an at will contract, the uncontradicted evidence is that it was brought about because of the incident of October 9, 1968." The uncontroverted evidence was that Abell did not know prior to October 11 that Cunningham had

increased prices and Judge Menchine's findings of fact in connection with his resolution of the motion for judgment n.o.v. are fully supported by the record and in our view were entirely justified.

Cunningham also urges that Abell was guilty of tortious interference in undertaking to render service to Goodwin, Owens and Helmig prior to October 11. The short answer is that Cunningham had terminated his at will contract with each of them and had refused to renew it before Abell began to serve them.

Finally, Cunningham says that the applicable law is not § 762 of the Restatement *Torts* but rather § 766, which reads: "Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby." The Scope Note to § 762, considered in the context of the instant facts, shows that § 762 is the applicable section.[4] It is indisputable that Abell made no approach whatever to Cunningham's customers (other than the justified approach to Goodwin, Owens and Helmig) prior to the time on October 11, when it ended its at will relationship with Cunningham, which it had the right to do. When that relationship was ended, it automatically ended Cunningham's relationships with the subscribers he served on behalf of Abell. The actions of Judge Menchine which Cunningham here challenged were properly taken.

> *Judgment affirmed, w i t h costs.*

---

4. The Scope Note reads:

"This Topic deals only with the liability for harm caused to a person by a mere refusal to enter into business relations with him. It does not deal with the liability for harm caused to him by inducing third persons not to do business with him, though the means of inducement may be a refusal to have business relations with the third persons unless they refrain from doing business with him. Refusing to do business with a person is one situation; inducing or compelling others not to do business with him is quite a different situation. This Topic deals with the former situation; Topic 2 (§§ 766-774) deals with the latter. * * *."