DESIGN AND FUNDING, INC. *v.*
BETZ GARAGE, INC.

[No. 71, September Term, 1980.]

*Decided December 31, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Thomas J. Peddicord, Jr.,* with whom was *William F. C. Marlow, Jr.,* on the brief, for appellant.

No brief filed for appellee.

RODOWSKY, J., delivered the opinion of the Court. ELDRIDGE and DAVIDSON, JJ., concur in part and dissent in

part. DAVIDSON, J., filed an opinion at page 280 *infra,* concurring in part and dissenting in part, in which ELDRIDGE, J., joins.

Certiorari was granted in this case in order to determine two questions concerning fundamentals of the operation of Md. Code (1975, 1981 Cum. Supp.), Title 14, "Miscellaneous Consumer Protection Provisions," Subtitle 10, "Automotive Repair Facilities," §§ 14-1001 through 14-1009 of the Commercial Law Article.[1]

---

1. The full text of the Automotive Repair Facilities law is set forth below:

§ 14-1001. Definitions.

(a) *In general.* — In this subtitle the following words have the meanings indicated.

(b) *Automotive repair facility.* — "Automotive repair facility" means any person who diagnoses or corrects malfunctions of a motor vehicle for financial profit.

(c) *Motor vehicle.* — "Motor vehicle" has the meaning stated in Title 11 of the Transportation Article.

(d) *Person.* — "Person" includes an individual, corporation, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity.

§ 14-1002. Written estimate for repair work.

(a) *Written estimate required; fee.* — (1) Before beginning any repair work on a motor vehicle for which a customer is charged more than $50, an automotive repair facility shall give the customer on his request a written statement which contains:

(i) The estimated completion date; and

(ii) The estimated price for labor and parts necessary to complete the work and

(iii) The estimated surcharge; if any.

(2) The automotive repair facility may charge a reasonable fee for making the estimate.

(b) *Prohibited charges.* — An automotive repair facility may not charge a customer without his consent any amount which exceeds the written estimate by 10 percent.

(c) *When repair delay excused.* — An automotive repair facility is not liable for breach of the written estimated completion date for a repair if the delay is caused by:

(1) An act of God;

(2) Strike;

(3) Unexpected illness; or

(4) Unexpected shortage of labor or parts.

(d) *When written estimate not required.* — This section does not require an automotive repair facility to give a written estimate if the facility does not agree to perform the requested repair work.

§ 14-1003. Required invoice.

(a) *Work description.* — An automotive repair facility shall prepare an invoice which describes:

Respondent, Betz Garage, Inc. (Betz), was the plaintiff in
an action filed in the District Court of Maryland at Towson,

(1) All work done by it, including all warranty work; and
(2) All parts supplied by it.
(b) *Used, rebuilt, or reconditioned parts.* — The invoice shall
state clearly if any used, rebuilt or reconditioned parts have been
supplied or if a part of a component system supplied is composed
of used, rebuilt, or reconditioned parts.
(c) *Copies of invoice.* — After the customer signs the invoice, the
automotive repair facility shall give him a copy of it and retain a
copy.

§ 14-1004. Replaced parts to be returned to customer.

(a) *Required return.* — Except as provided in subsection (b) of
this section, an automotive repair facility shall tender return of all
replaced parts to the customer.
(b) *Exception.* — Subsection (a) of this section does not apply to
replaced parts which are required to be returned to the manufac-
turer or distributor under a warranty agreement.

§ 14-1005. Civil action.

This subtitle does not:
(1) Prohibit a person from filing an action for damages against
an automotive repair facility; or
(2) Require a person first to exhaust any administrative remedy
he may have.

§ 14-1006. Unauthorized repairs.

An automotive repair facility may not charge the customer for
repairs not originally authorized or requested by the customer.
Additional repairs may be charged to the customer if the automo-
tive repair facility receives written or oral permission from the
customer.

§ 14-1007. Customer complaints.

Any person aggrieved by a violation of any provision of this
subtitle may take any action available under the consumer pro-
tection title of this article. Complaints may be filed with the Con-
sumer Protection Division of the office of the Attorney General.

§ 14-1008. Customer rights on invoice.

(a) In addition to the provisions of § 14-1003 of this subtitle, if
the customer is charged more than $50, the invoice shall inform
the customer of the following rights:
(1) That a customer:
(i) May request a written estimate for repairs which cost in
excess of $50; and
(ii) May not be charged any amount ten percent in excess of the
written estimate without his consent;
(2) That the customer is entitled to the return of any replaced
parts except when parts are required to be returned to the manu-
facturer under a warranty agreement; and
(3) That repairs not originally authorized by the customer may
not be charged to the customer without the customer's consent.
(b) The provisions of subsection (a) shall be:
(1) Displayed conspicuously in easily readable type;

Baltimore County, against the petitioner herein, Design and Funding, Inc. (D&F). Betz claimed $831.30 on open account of which $762.49 was for repairs to D&F's Cadillac Eldorado and $68.81 was for repairs to its International truck. Judgment was entered in favor of Betz and affirmed by the Circuit Court for Baltimore County in an appeal on the record. D&F contends that it has no obligation to pay for the repairs, based upon a two-step argument. First, Betz is said to have violated the statute (1) by failing to advise D&F, prior to the transaction, of certain customer rights enumerated in § 14-1008 and (2) by failing to return most of the parts which had been replaced in the repair of the Cadillac, contrary to § 14-1004. Secondly, D&F argues that either one of the omissions renders a contract to repair unenforceable.

The parties have been doing business for approximately 15 years. On April 30, 1979 the Cadillac was brought into the Betz garage with the complaint of a grinding noise. No writings were signed by, or, at that time, furnished to, a representative of D&F. Road testing revealed that the noise was both in the drive wheels in front and in the rear. Stethoscopic examination of the front wheels, while being engine rotated on a lift, disclosed the noise was greater on the left side than the right. After the rear wheels were pulled, the bearings were found to be pitted. Betz's service manager telephoned the president of D&F, Alden L. Coke (Coke), and advised that "the expenses were going to get pretty high," and that the car "was going to need a fair amount of work." The service manager testified that Coke told him that he "knew that [Coke] didn't spare any expense on his baby" and to "go ahead." Coke admitted telling the service manager that he needed a car in "good mechanical driving condition." No estimated dollar amount was given

---

(2) Physically separated from the other terms of the invoice; and
(3) Listed under the printed heading "Customer's Rights."

§ 14-1009. Penalties.

A violation of any provision of this subtitle is an unfair or deceptive practice within the meaning of Title 13 of this article and is subject to the enforcement and penalty provisions contained in Title 13.

by Betz. Major components of the bill for the Cadillac repairs are one constant velocity joint for the left front wheel ($245.00), two hubs for the front wheels ($160.80), two front wheel bearings ($92.36) and labor by Betz and by a subcontractor ($174.00). The Cadillac was picked up by D&F pursuant to an arrangement between the parties under which Betz extended credit to D&F and billed later.

There is a conflict in the record, which was unresolved by the trial judge, as to whether the Cadillac was picked up by the president of D&F or by his secretary. Coke testified that he got the car from Betz and received the customer copy of the invoice. He says he complained to the service manager at that time that the bill was "preposterous" and asked for the return of parts, but obtained only one of the rear wheel bearings. Betz's service manager testified that D&F's president telephoned and asked for the parts at a time "much later" than when the car was returned to D&F, and that the rear wheel bearing was the only part "still laying around." There was no evidence from Betz that the parts were tendered to D&F's representative, whoever it might have been, at the time the Cadillac was picked up.

D&F's truck had been in the Betz garage in early April 1979 for new brakes. It was brought back on May 7, 1979 for replacement of the master cylinder.

Betz utilized a printed, one page form which is a combined repair authorization and invoice. It contains separate sections for identifying information relating to the customer and his vehicle, for instructions to the mechanic and descriptions of the work done, for labor charges, and for itemizing, with prices, the materials used. At the bottom of the form, above the space for the customer's signature, is a preprinted section which refers to the customer rights set forth in § 14-1008. Copies of this form, completed as to the Cadillac repairs and the May 7 truck repairs but unsigned by D&F, were sent to D&F when the account was billed by Betz.

D&F refused to pay because it considered the amount of the charges for repair of the Cadillac to be unreasonable. The

trial judge found that Betz's bill "was just and reasonable," that "the repairs were necessary to repair the car," that "they were authorized by" D&F, and that Coke "seems perfectly satisfied the vehicles are running fine . . . ." D&F produced no evidence of damage or loss resulting from the alleged violations of the statutes involved here.

(i)

Section 14-1008 provides that the invoice of the automotive repair facility shall inform the customer of three rights: (1) that the customer may request a written estimate for repairs which cost in excess of $50 and may not be charged any amount more than 10% in excess of the estimated amount without his consent; (2) that the customer is entitled to the return of any replaced parts; and (3) that repairs not originally authorized by the customer may not be charged to him without his consent. D&F contends that "the obvious meaning of the statute [is] that a customer is to be advised of his rights before any other action takes place." That is not what the statute says.

The Automotive Repair Facilities law designates the invoice to the customer as the instrumentality for informing the customer of his rights. That invoice is to contain not only the three rights enumerated in § 14-1008, but also the matter required by § 14-1003. It is § 14-1003 which requires the facility to prepare an invoice. An "invoice" is "an itemized statement furnished to a purchaser by a seller and [usually] specifying the price of goods or services and the terms of sale." Webster's Third New International Dictionary (1976). The invoice under § 14-1003 (a) (1) and (2) is to describe "[a]ll work done" and "[a]ll parts supplied" by the repair facility. If used, rebuilt or reconditioned parts "have been supplied," the invoice shall clearly so state, under § 14-1003 (b). The facility "shall" give the customer a copy of the invoice, after he signs it, pursuant to § 14-1003 (c). Reference in the past tense to what the facility has already done in § 14-1003's delineation of what the invoice

must contain clearly reflects that the completed invoice, containing the statement of customer rights, is required to be delivered to the customer after the work has been done, rather than before it begins, as D&F contends.

Commencement of a potential repair transaction is dealt with in § 14-1002, relating to a written estimate. However, the written estimate is not an automatic right in all transactions as is the statement of customer rights on the invoice. If the charge is more than $50, then the repair facility "shall give the customer *on his request* a written statement" containing the "estimated completion date," "the estimated price for labor and parts necessary to complete the work" and the "estimated surcharge, if any." § 14-1002 (a) (emphasis added). The facility may impose a reasonable fee for making the estimate, *id.,* and is not required to give a written estimate if it does not agree to perform the requested work. § 14-1002 (d). If a written estimate is rendered, § 14-1002 (b) gives the repair facility a 10% tolerance over the estimated amount, without obtaining further customer consent. Additional repairs, not originally authorized or requested by the customer, may be charged if permission is received from the customer. That permission may be either oral or written. § 14-1006.

Because one of the customer rights which must be disclosed on the invoice relates to the right to obtain a written estimate, D&F would construe § 14-1008 as requiring that the disclosure of customer rights be made as the first step in a potential transaction. In this way the advice concerning the right to a written estimate would be given early enough to permit the customer to request, and if required, to pay for, a written estimate on the particular contemplated transaction. It would, of course, have been possible for the General Assembly to have required that the disclosure of customer rights enumerated in § 14-1008 be made before any other transaction takes place, but the General Assembly has not done so. Section 14-1008 expressly ties the disclosure requirement to the invoice, which in its ordinary meaning is the document setting forth amounts actually billed. Further, the invoice

disclosures of § 14-1008 (a) are "[i]n addition to the provisions of § 14-1003 of this subtitle," which require an invoice to describe the work done, the parts furnished, and any used parts which may have been supplied. "[A] court is generally not at liberty to surmise a legislative intention contrary to the plain language of the statute, or to indulge in the license of inserting or omitting words with the view of making the statute express an intention which is not evidenced in the original form." *Welsh v. Kuntz,* 196 Md. 86, 93, 75 A.2d 343, 345 (1950).

Nor does the statute, when construed in accordance with the plain meaning of the words used, produce an absurd result. In enacting consumer protection regulation the General Assembly has the function of balancing the benefit to be received by the consumer with the burden to be placed upon the business regulated. The requirements for the content of the invoice, now found in § 14-1003, were part of the Automotive Repair Facilities law as originally enacted by Ch. 695 of the Acts of 1974. *See* Md. Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.), Art. 83, § 51 (b). The customer rights disclosure requirement of present § 14-1008 was later enacted by Ch. 431 of the Acts of 1975. The General Assembly could have directed that an additional, pre-transaction disclosure statement be given, but it chose instead to utilize the already mandated invoice. The Legislature required that the customer rights disclosures be "[p]hysically separated from the other terms of the invoice" and be conspicuously displayed in easily readable type under the printed heading "Customer Rights." § 14-1008 (b). This legislative decision does not render § 14-1008 (a)'s disclosures ineffective. Chapter 431 of the Acts of 1975, which was approved April 22, 1975, had a delayed effective date of January 1, 1976.[2] Each time the owner of a motor vehicle would have more than $50 worth of work done in an automotive repair facility in this

---

2. Delayed effective dates are not unusual where a proposed regulation will require the change of existing business forms. Here, automotive repair facilities had until January 1, 1976 to use up existing inventories of invoice forms which would have been rendered obsolete by a July 1, 1975 effective date.

State after January 1, 1976, each such owner would receive on the invoice a statutorily mandated disclosure of customer rights. The General Assembly could certainly reasonably have concluded that disclosures on the invoice would, in a relatively short period of time, satisfy its objectives without the necessity of mandating the rights disclosure at the front end of every transaction, with the other invoice content requirements at the back end. Indeed, in the instant matter, D&F had been doing business with Betz prior to January 1, 1976 and had had new brakes installed on its truck by Betz in early April 1979. Prior to the transactions at issue here, D&F would have been invoiced by Betz on a form containing the statement of customer rights.

Our conclusion is also supported by a notice of proposed rule-making, promulgated in 2 Md. Reg. 1742 (1975) by the Division of Consumer Protection of the Office of the Attorney General of Maryland, which would have added § 02.01.03, "Automobile Repairs" to the Code of Maryland Regulations. Section 02.01.03.02B of the proposed rule stated its purpose as follows:

> (1) It is the intention of these rules to implement the "Automotive Repair Facility" law and to set forth requirements for the disclosure of certain information to customers *before* work is done on their motor vehicles.
> (2) The purpose of these rules is to require automotive repair facilities to advise customers of their right to an estimate of the cost of repairs .... [Emphasis added.]

Section 02.01.03.04B(1) would have made it an unfair or deceptive trade practice under Title 13 of the Commercial Law Article for an automotive repair facility "[t]o fail to post, in a conspicuous place in each area where motor vehicles are normally received for repair, a clearly visible and readable sign" setting forth a specified text under the heading "Customer's Rights Under Maryland Law," including the right to request a written estimate for repairs which cost in excess of $50. The proposed regulation was with-

drawn at 3 Md. Reg. 720 (1976). This effort by the Consumer Protection Division to require by regulation that the disclosure of customer rights be given by means of a sign before the work is done is a recognition that the disclosure by way of the invoice, as required by the statute, is made after the work is done.

We hold that Betz did not violate § 14-1008 when it did not furnish a statement of customer rights to D&F prior to either the Cadillac or the truck transactions.

(ii)

Section 14-1004 (a) provides that "an automotive repair facility shall tender return of all replaced parts to the customer." The exception in subsection (b) for parts under warranty is not applicable here. The record is silent as to whether the replaced cylinder in the truck was or was not tendered by Betz to D&F. However, it is clear that replaced parts from the Cadillac were not tendered. The District Court did not make any express conclusions of law concerning the violation of § 14-1004 (a). The Circuit Court held that "this statutory violation does not, in and of itself, create sufficient grounds to declare the contracts void as against public policy, especially in light of the past dealings between the parties and compliance with the other statutory provisions." D&F contends that this violation renders the contract to repair the Cadillac void and unenforceable. It relies on illegal contract cases, citing, *inter alia, Cunningham v. A.S. Abell Company,* 264 Md. 649, 288 A.2d 157, *cert. denied,* 409 U.S. 865, 93 S. Ct. 160, 34 L. Ed. 2d 114 (1972) (agreement between newspaper and route distributor providing for territorial monopoly, in violation of § 1 of the Sherman Act, is unenforceable); and *Harry Berenter, Inc. v. Berman,* 258 Md. 290, 265 A.2d 759 (1970) (contract for home improvements not enforceable by contractor who was not licensed as required by Maryland Home Improvement Law).

We see the issue somewhat differently. Presumably D&F's analysis is influenced by the procedural posture in which

Betz is suing D&F for the reasonable value of the work done and materials provided. But there was no statute which prevented Betz from entering into the contract. The subject matter of the contract was not prohibited. What occurred here is that Betz, in the course of performing a valid contract, violated § 14-1004; the contract *could* have been performed without any statutory violation.

We have said that "[i]t is a familiar principle of law that subsisting laws enter into and form part of a contract as if expressly referred to or incorporated in its terms." *Beca v. City of Baltimore,* 279 Md. 177, 182, 367 A.2d 478, 481 (1977). *See Dennis v. City of Rockville,* 286 Md. 184, 406 A.2d 284 (1979). The principle was applied in *Denice v. Spotswood I. Quinby, Inc.,* 248 Md. 428, 237 A.2d 4 (1968) where the local building code was held to form part of a contract in which the builder promised to construct and sell a residence to the plaintiff. The purchaser refused to consummate the transaction because the height of the recreation room was only 6 feet 9 inches, whereas the building code required a height of not less than 7 feet 6 inches. We held that the plaintiff was entitled, at a minimum, to recover the deposit previously paid and said (248 Md. at 437-38, 237 A.2d at 9):

> For the reasons stated we are of the opinion that appellant was justified in his refusal to consummate the purchase of the dwelling because of the builder's failure to comply with the building code which we hold to be an implied condition of the contract. We do not intend this opinion to be construed as holding that any failure to comply with the provisions of a building code will excuse performance of the contract by the complaining party. However, where the noncompliance is substantial, as in this case, we think non-performance is justified.

In the case at bar the contract was to repair the Cadillac at a reasonable price. Betz breached this contract by failing to tender the return of parts, but, as found by the trial court,

Betz also corrected the problem which D&F sought to have repaired. The issue is whether the breach by Betz is so material that D&F is entirely excused from performing its promise to pay, or whether, under the doctrine of substantial performance, Betz is entitled to recover despite its breach.

A full analysis of the principles underlying substantial performance was set forth in *Speed v. Bailey,* 153 Md. 655, 660-61, 139 A. 534, 536 (1927), where we said:

> The general rule is that stated in 6 *R. C. L.* 926-927: "It is not every partial failure to comply with the terms of a contract by one party which will entitle the other party to abandon the contract at once. In order to justify an abandonment of it and of the proper remedy growing out of it, the failure of the opposite party must be a total one — the object of the contract must have been defeated or rendered unattainable by his misconduct or default. For partial derelictions and non-performance in matters not necessarily of first importance to the accomplishment of the object of the contract, the party injured must seek his remedy upon the stipulations of the contract itself. Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract, or the failure to perform the contract must be in respect to matters which would render the performance of the rest a thing different in substance from that which was contracted for. * * * Where a covenant goes only to a part of the consideration of a contract, is incidental and subordinate to its main purpose, and its breach may be compensated in damages, such a breach does not warrant a rescission of the contract, but the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom." By this rule, compensation in damages for slight breaches is substituted for the remedy afforded by rescission of the whole contract. The rule

rests upon the principle that greater equity will be maintained between the parties by compelling the one, injured by slight variances or failure to comply literally with all of the terms of the contract, to accept the contract as performed and recover such damages occasioned by the breach as he may be able to show. A departure from this rule would result in permitting any deviation, no matter how minute or unimportant, to be made the basis for the rescission of the contract, and allowing the one so rescinding to obtain an unfair and unconscionable advantage by electing to rescind or retain the bargain, as self-interest might dictate. The great weight of authority shows a recognition of this principle by the courts, although they are not entirely harmonious. The real and substantial difficulty has been in applying the principle to the varying facts of each particular case. The rule has been more widely applied to building contracts, for the reason that it was found to be inequitable to allow the owner of the land to rescind a contract for the erection of a building upon his land, and thereby retain the benefits resulting from a substantial performance of the building contract, without any obligation to pay therefor.

While the above is true, the application of the doctrine of substantial performance has not been confined to building contracts, but has been applied in many cases where the breach was relatively small as compared to the whole contract and did not go to the root of the contract; that is to say, *it is applied where the breach complained of is inconsequential in its nature and is readily compensated for by damages.* [Emphasis added.]

By virtue of § 14-1004, the performance of a contract which is subject to the Automotive Repair Facilities law and which involves the replacement of parts includes an obligation of the facility to tender the return of replaced parts, unless they are required to be returned to the manufacturer

or distributor under a warranty agreement. For there to be full performance by the facility, parts which have been replaced must also be tendered to the customer. The statutory requirement is undoubtedly intended to discourage fraudulent charges for parts which have not in fact been replaced or which have been unnecessarily replaced. Tender of replaced parts also gives the customer an opportunity to take the replaced parts with him for whatever further examination the customer wishes to have made, including attempting to determine whether parts were unnecessarily replaced. We must view the breach by Betz in the light of this statutory policy.

This is not a case in which the breach by Betz is readily compensable by damages. D&F is unable to show whether it suffered any actual loss resulting from the failure to tender return of replaced parts because the replaced parts are the evidence needed to demonstrate whether their replacement was unnecessary. Were we to say that D&F is relegated to a set-off for such damage as it can demonstrate to have resulted from the breach by Betz, it would create a "Catch-22" situation. It would be a frustration of the legislative policy underlying § 14-1004 for the repair facility's own violation to become the basis for finding that its partial performance was nevertheless substantial.

Nor, under the peculiar facts of this case, do we deal with a situation in which the breach is inconsequential, or in which the breach relates to a divisible part of the repair contract so that a quantum meruit recovery could be had by Betz. The invoice for the work on the Cadillac reflects four types of charges. "Material used" consisted of $560.46, of which $21.90 was for two rear wheel bearings. Labor was $120.00, of which $36.80 was to replace both rear inner wheel bearings. "Sublet repairs" were $54.00, representing the charge by another facility for pressing the bearings in the front wheel hubs. Sales tax was $28.03. Only one rear wheel bearing was returned, or tendered, to D&F. The Betz invoice for the Cadillac may be restated in terms of charges applicable to parts returned and parts not returned as follows:

| Charges Applicable to | Parts Returned | Parts Not Returned | Total |
|---|---|---|---|
| Parts | $10.95 | $549.51 | $560.46 |
| Labor | 18.40 | 155.60 | 174.00 |
| Tax (pro-rated) | .56 | 27.47 | 28.03 |
| Total | $29.91 | $732.58 | $762.49 |
| % | 3.9% | 96.1% | 100.0% |

Thus, the breach by Betz affected 96.1% of the total Cadillac charges. While the "question of whether there has been substantial compliance and whether a deviation from contract requirements is wilful or justified, is ordinarily a question for the trier of the facts," *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 621, 112 A.2d 901, 906 (1955), we conclude on the facts here that the breach by Betz, as a matter of law, went to the root of the contract. The breach was total and D&F is excused from its promised performance.

Because the repairs to D&F's truck were made under a separate contract and D&F did not prove any failure to return replaced parts under that contract, D&F is not excused from its promise to pay for the truck repairs.

> *Judgment of the Circuit Court for Baltimore County vacated and judgment is hereby entered in favor of Betz Garage, Inc. against Design and Funding, Inc. for $68.81 together with interest from November 30, 1979.*
> *Costs to be evenly divided by the parties.*

*Davidson, J., concurring in part and dissenting in part:*

The majority here initially holds that "Betz did not violate § 14-1008 when it did not furnish a statement of customer rights to D&F prior to either the Cadillac or the truck transactions." I do not agree. In my view, the repair facility here violated § 14-1008 (a) because that section requires a

repair facility, before repairs are made, to present an invoice to a customer, informing the customer of a right to request a written estimate.

The majority additionally holds, with respect to the repair of the car, that the repair facility violated § 14-1004. However, notwithstanding this violation, the majority finds that the contract was valid and enforceable, that the doctrine of substantial performance applied, and that under that doctrine, the repair facility was not entitled to recover for the repair of the car. Finally, the majority holds, with respect to the repair of the truck, that there was insufficient evidence to show that the repair facility failed to tender return of the truck's master cylinder and, therefore, that the repair facility violated § 14-1004. The majority concludes that the repair facility was entitled to recover for the repair of the truck.

I agree, with respect to the repair of the car, that the repair facility violated § 14-1004 that requires the return of unwarranted replaced parts. However, I do not agree with the majority that the contract was valid and enforceable and that the doctrine of substantial performance applies. In my view, the contract for the repair of the car was performed in violation of the requirements of a statute that imposed criminal penalties for failure to comply. The contract, therefore, is illegal as against public policy and should not be enforced. Therefore, I conclude that the repair facility was not entitled to recover for the repair of the car. Under these circumstances, I concur with the majority's result with respect to the repair of the car.

Because, in my view, the repair facility violated § 14-1008 (a) with respect to the repair of the truck, that contract is also illegal as against public policy and should not be enforced. Therefore, I conclude that the repair facility was not entitled to recover for the repair of the truck. Under these circumstances, I respectfully dissent with respect to the repair of the truck.

The initial question to be determined is whether § 14-1008 (a) requires a repair facility, before repairs are

made, to present an invoice to the customer informing the customer of the right to request a written estimate. While the statute expressly requires the repair facility to inform the customer of the right, it does not specify the time at which the customer must be so informed. Thus the language of § 14-1008 (a) is ambiguous. If § 14-1003 and § 14-1008 are construed together, the use of the past tense might indicate that the invoice notifying the customer of the rights delineated in § 14-1008 is not required to be presented until after the repairs are made. However, such a construction leads to an unreasonable, illogical result that is inconsistent with common sense because a customer would not be notified of the right to a written estimate until it was already too late for the right to be exercised.

The cardinal rule of statutory construction is to ascertain and effectuate the actual intent of the Legislature. In determining this legislative intent, a court must read the language of the statute in context and in relation to all of its provisions. In addition, it may consider the statute's legislative history and must consider its purpose. *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Gartelman,* 288 Md. 151, 156, 416 A.2d 734, 737-38 (1980); *Department of State Planning v. Mayor of Hagerstown,* 288 Md. 9, 14, 415 A.2d 296, 299 (1980). Results that are unreasonable, illogical or inconsistent with common sense should be avoided and an interpretation should be given which will not lead to absurd or anomalous results. *Kindley v. Governor of Maryland,* 289 Md. 620, 625, 426 A.2d 908, 911-12 (1981); *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 583, 414 A.2d 1246, 1253 (1980); *Schweitzer v. Brewer,* 280 Md. 430, 438-39, 374 A.2d 347, 352 (1977).

A review of the legislative history of the Act indicates that its purpose is to protect the public from unfair dealings by automotive repair facilities. Section 14-1001 et seq. was originally enacted as Md. Code (1957, 1969 Repl. Vol., 1974 Cum.Supp.), Art. 83, §§ 50-52, Sales and Notices.[1] The

---

1. Ch. 695, 1974 Md.Laws, effective 1 July 1974.

purpose of the Act was to "impos[e] certain requirements on automotive repair facilities" and to grant "certain rights to individual consumers."[2] The Act was recodified, without substantive change, as Md. Code (1975) Title 14, Miscellaneous Consumer Protection Provisions of the Commercial Law Article.[3]

The statutory scheme as originally enacted and recodified required repair facilities, before beginning any repair work costing more than $50 to give to customers, upon request, a written statement containing the estimated completion date and the estimated cost of the work. § 14-1002 (a). Repair facilities were prohibited from charging customers in excess of 10 percent of this estimate without the customer's consent. § 14-1002 (b).[4]

The repair facility was required to prepare an invoice that described all work performed, parts supplied, and any used or rebuilt parts used in the repair. § 14-1003 (a) & (b). After the customer signed the invoice, the repair facility was required to give the customer a copy of it. § 14-1003 (c). In addition, the repair facility was required to tender return of all replaced parts not under a manufacturer's warranty. § 14-1004. Customers were not prohibited from filing an action for damages. § 14-1005. Manifestly, the entire statutory scheme as originally enacted and recodified was designed to impose certain requirements on repair facilities for the protection of the public.

Effective 1 January 1976, §§ 14-1006 through 14-1009 were added to the Act.[5] These amendments imposed additional requirements on repair facilities and granted additional rights to consumers. Repair facilities were prohibited from charging for repairs not originally authorized by customers. § 14-1006.[6] In addition to the right to bring civil

---

2. *See* n.1 above.
3. Ch. 49, § 3, 1975 Md.Laws, effective 1 July 1975.
4. § 14-1002 (b) provides:

"An automotive repair facility may not charge a customer without his consent any amount which exceeds the written estimate by 10 percent."
5. Ch. 431, 1975 Md.Laws, effective 1 January 1976.
6. § 14-1006 provides:

"An automotive repair facility may not charge the customer for

actions for damages, customers were granted the right to take any action under the Consumer Protection Act, Md. Code (1975 & 1981 Cum.Supp.) § 13-101 et seq. of the Commercial Law Article, including the right to file complaints with the Consumer Protection Division of the Office of the Attorney General. § 14-1007.[7] Moreover, a violation of the Act was made "an unfair or deceptive practice" within the meaning of the Consumer Protection Act and was made subject to the enforcement and penalty provisions of the Consumer Protection Act. § 14-1009.[8] Such unfair or deceptive trade practices were expressly prohibited. § 13-303.[9] The performance of such a prohibited act was made a crime and a person who engaged in such an act was subject to a fine not exceeding $1,000 or imprisonment not exceeding one year or both, in addtion to any civil penalties.[10]

Most important, these amendments established that customers were entitled to be informed of their rights. If a customer was charged more than $50, the repair facility's invoice was required to inform the customer in "conspicuous readable type" listed under the printed heading, "Customer's Rights," that the customer had the right to

___

repairs not originally authorized or requested by the customer. Additional repairs may be charged to the customer if the automotive repair facility receives written or oral permission from the customer."

**7.** § 14-1007 provides:

"Any person aggrieved by a violation of any provision of this subtitle may take any action available under the consumer protection title of this article. Complaints may be filed with the Consumer Protection Division of the office of the Attorney General."

**8.** § 14-1009 provides:

"A violation of any provision of this subtitle is an unfair or deceptive practice within the meaning of Title 13 of this article and is subject to the enforcement and penalty provisions contained in Title 13."

**9.** § 13-303 provides in pertinent part:

"A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle. . . ."

**10.** § 13-411 (a) provides in pertinent part:

"[A]ny person who violates any provision of this title is guilty of a misdemeanor and, unless another criminal penalty is specifically provided elsewhere, on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding one year or both, in addition to any civil penalties."

request a written estimate, the right not to be charged in excess of 10 percent of this estimate, the right to the return of any unwarranted replaced parts, and the right not to be charged for repairs not originally authorized. § 14-1008. These amendments to the statutory scheme reinforce the conclusion that the purpose of the Act was to protect the public. Indeed, the fact that one year after the Legislature established the customer's right to a written estimate, it chose to maximize the customer's opportunity and ability to exercise that right by creating a mechanism by which to inform the customer of that right, demonstrates the Legislature's firm commitment to protect the public from unfair dealings by automotive repair facilities.

Simple logic and common sense dictate that the legislative purpose of protecting the consumer by establishing the right to a written estimate and notice of that right cannot be achieved if the notice and the written estimate are not presented to the customer before repairs are made. Accordingly, I would hold that § 14-1008 (a) requires a repair facility to present an invoice to a customer informing the customer of the right to request a written estimate before repairs in excess of $50 are made. Such a result is consonant with the language, legislative history, and the purpose of § 14-1008 (a). Indeed, to hold otherwise would lead to a result that is unreasonable, illogical, and inconsistent with common sense.

Here the record shows that the customer was not given an invoice or any other document before the repairs were made, informing it of the rights delineated in § 14-1008 (a), including the right to a written estimate. Moreover, there is uncontradicted testimony in the record to indicate that, at the critical times with respect to both the car and the truck, the customer was not advised of its right to a written estimate and was not aware of that right. The facts in this case, with respect to the car, dramatically demonstrate that a customer's ability to protect itself is substantially diminished by the absence of an awareness of the right to a written estimate.

Here, the repair facility informed the customer by telephone that substantial, expensive work would be required. The customer authorized all necessary repairs and indicated that it did not care about the expense. Under these circumstances, it is apparent, as recognized by the District Court,[11] that the only way in which the customer could have protected itself against an excessive charge was to demand a written or oral estimate. Section 14-1008 (a) of the Act requires the repair facility to inform the customer of that right. Had the customer been so informed, it might have exercised the right and, upon receipt of an estimate, might have refused to authorize the repairs. Thus, the repair facility's failure to comply with the statutory requirement of § 14-1008 (a) deprived the customer of a basic protection the Legislaure intended to accord. Under the circumstances here, there was a material violation of § 14-1008 (a) of the Act with respect to the repair of both the car and the truck.[12]

The next question to be determined is whether there was also a violation of § 14-1004 (a) of the Act. The language of that section is plain and unambiguous. It requires the repair facility to tender the return of unwarranted replaced parts.

Here the record shows that the car was not under a manufacturer's or distributor's warranty at the time the repairs were made. The repair facility tendered the return of one rear wheel bearing that it replaced in the car. It failed to tender the return of one strap, one joint, two bearings, two hubs, two seals, one axle carrier bearing, and one rear wheel bearing that it replaced in the car. There was insufficient

---

11. The District Court specifically stated:

"[W]hat happened, obviously, is that Mr. Coke just didn't expect to get any $750 bill and that's what the bill was. Perhaps if Mr. Carmen had said well, wait a minute, you know, even though you are telling me to go ahead, this thing could run 800 or $1,000, he might have hesitated. He may not, I don't know. But at least *that's the only thing I see that the plaintiff could have done to protect himself more."* (Emphasis added.)

12. I emphasize that I am not here considering the questions whether there would be a material violation of § 14-1008 (a) if a repair facility failed to give the required notice to a customer who nonetheless had actual knowledge of the right to a written estimate, or to a customer who expressly or by conduct waived the right, or if a repair facility gave the required notice by a method other than the presentation of an invoice.

evidence to show that the repair facility failed to tender the return of a master cylinder that it replaced in the truck. Under the circumstances here, there was a material violation of § 14-1004 of the Act with respect to the repair of the car, but not with respect to the repair of the truck.

The final question to be determined is whether the repair facility may enforce the contracts, notwithstanding its violations of the Act. With respect to the repair of the car, the majority asserts that, notwithstanding the fact that the repair facility had violated § 14-1004, its contract to repair the car was valid and enforceable. The majority maintains that the doctrine of substantial performance applied, and that under that doctrine, the repair facility was not entitled to recover for the repair of the car. In support of its position, the majority relies upon four cases. However, the question presented here of whether a contract is illegal, invalid and unenforceable when in the performance of the contract a person engages in a statutorily prohibited act for which a criminal penalty is imposed was not raised, considered or decided in a single one of the cases [13] relied upon by the majority. Accordingly, those cases are inapposite.

---

**13.** In *Beca v. Mayor of Baltimore,* 279 Md. 177, 182, 367 A.2d 478, 481 (1977), the police department of Baltimore City sued an employee who violated a departmental regulation requiring reimbursement of proceeds of a settlement obtained from a third party tort feasor. This Court held that the regulation requiring reimbursement was a condition implied in the contract of employment and was enforceable.

In *Dennis v. Mayor of Rockville,* 286 Md. 184, 192, 406 A.2d 284, 288 (1979), a homebuyer sued a seller who violated an ordinance imposing a duty on property owners or their agents to give purchasers an opportunity to examine the master plan for the area, and giving the buyer the right to terminate the contract in the event the ordinance was violated. This Court determined that the provision permitting the purchaser to terminate was not a forfeiture and, indeed, that it was a condition implied in the contract of sale and was enforceable. Accordingly, this Court held that the buyer had the right to terminate.

In *Denice v. Spotswood I. Quinby, Inc.,* 248 Md. 428, 437-38, 237 A.2d 4, 9 (1968), a homebuyer sued a builder who violated a provision of the county building code requiring that the height for "habitable" rooms be 7½ feet. This Court determined that the building code provision was an implied condition of the contract and was enforceable. It held that because of the builder's violations of the code, the homebuyer was justified in his refusal to consummate the purchase of the dwelling.

In *Speed v. Bailey,* 153 Md. 655, 657-58, 139 A. 534, 535-36 (1927), a buyer sued a contractor who had violated certain terms and specifications of a contract of sale. The case involved no violation of a statute.

Moreover, in reaching its conclusion that the contract here was legal, valid and enforceable, the majority totally ignores rudimentary legal principles applicable to cases in which a person in the performance of a contract engages in a statutorily prohibited act for which a criminal penalty is imposed and, nonetheless, seeks to enforce the contract. Restatement of Contracts § 580 (1) (2) (a) (b) and (d) (1932) states in pertinent part:

"(1) Any bargain is illegal if either the formation or the performance thereof is prohibited by constitution or statute.

"(2) Legislative intent to prohibit the formation of a bargain, or an act essential for its performance, may be manifested by

"(a) express prohibition, or

"(b) making the formation of the bargain or the performance thereof a crime. . . .

. . .

"(d) requiring a license, inspection, or something similar from persons making such bargains or doing acts essential for their performance. . . ."

Comment a under § 580 states in pertinent part:

"The legislature can prohibit the formation of any bargain and thereby make it illegal. The question whether the legislature has done so depends on interpretation of the legislative action. In case of express prohibition or of declaring the act a crime there can be no doubt." [14]

Manifestly, none of these cases present the question here whether, when in the performance of a contract a person engages in a statutorily prohibited act for which a criminal penalty is imposed, the contract is illegal and may not be enforced.

**14.** Section 580 (c) and (e) states that legislative intent to prohibit an act essential for the performance of a contract may additionally be manifested by:

"(c) imposing a penalty for the formation of the bargain or for doing an act that is essential for the performance thereof, or

. . .

(e) other terms of a statute interpreted in the light of the purpose of its enactment."

Restatement of Contracts § 598 states:

> "A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value, except as stated in §§ 599-609."

Comment a under § 598 states in pertinent part:

> "[T]he rule of public policy that forbids an action for damages for breach of such an agreement is not based on the impropriety of compelling the defendant to pay the damages. That in itself would generally be a desirable thing. When relief is denied it is because the plaintiff is a wrongdoer, and to such a person the law denies relief. Courts do not wish to aid a man who founds his cause of action upon his own immoral or illegal act. If from the plaintiff's own statement or otherwise it appears that the bargain forming the basis of the action is opposed to public policy or transgresses statutory prohibitions, the courts ordinarily give him no assistance. The court's refusal is not for the sake of the defendant, but because it will not aid such a plaintiff. . . ."

These principles have been applied repeatedly and consistently in Maryland. In *Thorpe v. Carte,* 252 Md. 523, 528-30, 250 A.2d 618, 621-22 (1969), this Court specifically adopted and applied the principles embodied in § 580 and § 598 of the Restatement of Contracts. There, an unlicensed real estate broker sued a seller for refusal to pay his commission under a contract of sale. A statute, Art. 56, § 227, made it unlawful for any real estate broker or salesman to pay compensation to any unlicensed real estate broker for the performance of a service or act required to be performed by a licensed broker. Section 228 specifically prohibited recovery in court by an unlicensed broker for the performance of any prohibited service or act. In reaching its conclusion that the contract was illegal and unenforceable, this Court said:

> "Carte's contract to split his commission with Holmead, Frey violated §§ 227 and 228 and was illegal. 'Any bargain is illegal if either the formation or the performance thereof is prohibited by constitution or statute.' 2 Restatement *Contracts* § 580. Generally a party to an illegal bargain cannot recover either damages for its breach or, after rescission, the performance he has rendered or its value. 2 Restatement *Contracts* § 598." *Thorpe,* 252 Md. at 528-29, 250 A.2d at 621.

In addition, this Court, citing *Goldsmith v. Manufacturers' Liability Insurance Co. of New Jersey,* 132 Md. 283, 103 A. 627 (1918) and *Snodgrass v. Immler,* 232 Md. 416, 194 A.2d 103 (1963), established that when, in the performance of a contract, a person engages in a statutorily prohibited act, recovery is not permitted even though the statute itself does not expressly prohibit such recovery.

In addition, in *Harry Berenter, Inc. v. Berman,* 258 Md. 290, 296, 265 A.2d 759, 763 (1970), this Court emphasized the fact that when, in the performance of a contract, a person engages in a statutorily prohibited act, the contract is illegal and unenforceable and there can be no recovery even on a theory of *quantum meruit* and unjust enrichment. In *Harry Berenter, Inc.,* an unlicensed contractor sued to enforce a mechanic's lien against a homeowner for failure to pay under a construction contract. A statute, Art. 56, § 255, required the contractor to be licensed. That statute did not specifically prohibit recovery in court by an unlicensed contractor. In reaching its conclusion that the unlicensed contractor's contract or contracts were illegal and unenforceable, this Court said:

> "The appellant Berenter, Inc., also argues that unless the mechanic's lien is enforced, the Bermans will be 'unjustly enriched to no small extent.' However, as we said in *Thorpe v. Carte, supra,* quoting from 2 Restatement, *Contracts,* § 598, comment a:
>
>> 'The court's refusal is not for the sake of the

defendant, but because it will not aid such a plaintiff.'

"Nor is the contention that there is unjust enrichment of the defendants tenable. To permit a recovery on a *quantum meruit* would defeat and nullify the statute." *Harry Berenter, Inc.,* 258 Md. at 296, 265 A.2d at 763.

I recognize that both *Thorpe* and *Harry Berenter, Inc.* involve violations of licensing statutes. In such cases, in determining whether a contract is illegal and unenforceable, a distinction is drawn between a violation of a licensing statute regulatory in nature designed for the protection of the public, and a violation of a licensing statute designed to raise revenue. However, under the basic principles defined in § 580 and § 598 of the Restatement of Contracts in determining whether a contract is illegal and unenforceable, no distinction is made between violations of statutes designed for the protection of the public that require a license and violations of other statutes designed for the protection of the public that require other types of acts such as the giving of notice. Indeed, in Maryland, this Court has frequently recognized in a variety of other circumstances, that in order to discourage practices forbidden by law, contracts made or performed in violation of the requirements or prohibitions of a statute, particularly one that imposes a criminal penalty for the performance of a prohibited act, are held to be illegal as against public policy and ordinarily will not be enforced unless the Legislature indicates to the contrary. *Queen v. Agger,* 287 Md. 342, 346, 412 A.2d 733, 735 (1980) (contract for fee for health care service greater than that approved by Workmen's Compensation Commission); *Downing Dev. Corp. v. Brazelton,* 253 Md. 390, 398-400, 252 A.2d 849, 854-55 (1969) (contract for sale of corporate assets); *Thorpe v. Carte,* 252 Md. 523, 528-30, 250 A.2d 618, 621-22 (1969) (contract for division of commission between licensed real estate broker and unlicensed individual); *Van Meter v. Wilkinson,* 187 Md. 492, 496-99, 50 A.2d 557, 559-60 (1947) (contract by retired

army officer to assist in prosecuting a claim against United States); *Webb v. Haeffer*, 53 Md. 187, 190 (1880) (agreement to hold mortgage sale outside county where mortgaged property situated). 3 Pomeroy, *Equity Jurisprudence* § 930 at 646 (5th ed. 1941). *See also Gannon & Son, Inc. v. Emerson*, 291 Md. 443, 452, 435 A.2d 449, 454 (1981). I find no legislative intent to the contrary and would apply these principles here.

In my view, the repair facility materially violated § 14-1008 (a) of the Act with respect to the repair of both the car and the truck, and it materially violated § 14-1004 of the Act with respect to the repair of the car but not with respect to the repair of the truck. In so doing, it committed statutorily prohibited, unfair and deceptive practices that constitute a crime. The purpose of the Automotive Repair Facilities Act is to protect the consumer. I cannot conceive how that purpose can be achieved by holding a contract valid and enforceable, notwithstanding the performance of criminal acts by the party seeking enforcement. I will not here, as I would not in *Gannon & Son, Inc.*,[15] join with the majority in an unnecessary, convoluted, and tortured interpretation designed to deprive consumers of protections accorded to them by the Legislature. I would find both the contract for the repair of the car and the contract for the repair of the truck to be unenforceable.[16] Accordingly, I would reverse.

Judge Eldridge authorizes me to state that he joins me in the views expressed herein.

---

**15.** 291 Md. at 462, 435 A.2d at 459 (Davidson, J., dissenting).
**16.** Courts in other jurisdictions that have considered similar questions under similar statutes agree. *See, e.g.,* Bennett v. Hayes, 53 Cal.App.3d 700, 704, 125 Cal.Rptr. 825, 827 (Ct.App. 1975); Schreiber v. Kelsey, 62 Cal.App.3d Supp. 45, 48, 133 Cal.Rptr. 508, 509 (App.Dep't Super.Ct. 1976); Brooks v. R. A. Clark's Garage, Inc., 117 N.H. 770, 771-2, 378 A.2d 1144, 1145 (1977).