CIDER BARREL MOBILE HOME COURT et al.
v. MORRIS L. EADER et al.

[No. 86, September Term, 1979.]

*Decided May 26, 1980.*

572

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ▊ORTH, COLE and DAVIDSON, JJ.

*John Noble,* with whom were *Vivian V. Simpson* and *Simpson & Simpson* on the brief, for appellants.

*Robert E. Philo, Jr.,* for appellee Morris L. Eader. *H. Robert Erwin, Jr., Assistant Attorney General,* with whom were *Jay Laurence Lenrow, Assistant Attorney General, Michael J. Milton, Assistant Attorney General,* and *Jeanne B. Katz, Special Attorney,* on the brief, for appellee Attorney General of Maryland.

DAVIDSON, J., delivered the opinion of the Court. SMITH, J., concurs in the result.

The central question in this case is whether the Mobile Home Park Act, Md. Code (1974, 1979 Cum. Supp.), §§ 8A-101—114 of the Real Property Article, effective 1 July 1976, constitutes a "taking" of private property in violation of the Maryland Declaration of Rights, art. 24,[1] and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[2]

---

1. Md. Decl. of Rights, art. 24 provides in pertinent part:

"That no man ought to be . . . deprived of his . . . property, but . . . by the Law of the land."

1977 Md. Laws, ch. 681, ratified 7 November 1978, renumbered former art. 23.

2. U.S. Const. amend. XIV, § 1 provides in pertinent part:

"[N]or shall any State deprive any person of . . . property, without due process of law. . . ."

Recently, the problems of mobile home [3] ownership have been the focus of a considerable amount of study and comment. Research has shown that since 1964 there has been a rapid increase in the use of mobile homes as permanent residences. Indeed, mobile homes are providing an increasingly large proportion of new housing within the means of lower income families. Thus, by 1968, 90 percent of the new homes sold for under $15,000 were mobile homes. In that year, over six million people, comprising more than three percent of all American households, resided in approximately three million mobile homes. Presently, approximately 10 million people, representing 3.5 percent of all American households, live in mobile homes. Indeed, it is estimated that mobile homes now comprise 10 percent of all housing in the United States.

Despite the rising popularity of relatively low cost mobile homes, many communities have enacted zoning regulations which exclude them entirely or severely limit the areas where they may be placed, frequently restricting them to mobile home parks. Thus, the mobile home owner is compelled to rent space from the park owners who, because of the limited availability of space and the high cost of relocation, are able to dictate unfavorable rental terms and conditions. As a result, mobile home owners often have been forced to buy mobile homes from the park owner in order to obtain a site, to pay excessive entrance fees, to buy specified commodities from specified dealers, to pay the park owner a commission on the sale of the mobile home, or, upon sale, to remove it and pay an exit fee.[4]

---

3. "The mobile home is a detached, single-family dwelling unit designed for long-term occupancy, which distinguishes it from the motor home or travel trailer." Stubbs, *The Necessity for Specific State Legislation to Deal with the Mobile Home Park Landlord-Tenant Relationship,* 9 Ga. L. Rev. 212 n. 1 (1974-75).

4. *A Bill to Amend Section 2 of the National Housing Act Relative to Mobile Homes: Hearings on S. 2740 Before the Subcomm. on Housing and Urban Affairs of the Comm. on Banking and Currency,* 91st Cong., 1st Sess. 5 (1969) (statement of William B. Ross); Nyberg, *The Community and the Park Owner Versus the Mobile Home Park Resident: Reforming the Landlord-Tenant Relationship,* 52 B.U.L. Rev. 810 (1972); Hightower, *Mobile Home Park Practices: The Legal Relationship Between Mobile Home Park Owners and Tenants Who Own Mobile Homes,* 3 Fla. St. U.L. Rev. 103, 104 (1975); *The Necessity for Specific State Legislation,* 9 Ga. L.

Many states, including Maryland, have enacted remedial statutes designed to prohibit such abusive practices.[5] The Maryland Mobile Home Park Act (Act) is one such statute.[6]

The Act prohibits a park owner from denying access to park facilities on the basis of discriminatory criteria. § 8A-102.1. While the park owner may reserve the right to approve buyers of mobile homes which remain in the park after resale, he may not unreasonably withhold such approval. § 8A-102 (b). He is required to offer leases of at least one year to prospective residents. §§ 8A-103 (b), 105.[7]

---

Rev. at 212 n. 3, 213, 214-21; Manufacturing Report: Manufactured Housing Institute, Nov. 1979.

**5.** Ariz. Rev. Stat. § 33-1452 (1974); Cal. Civ. Code ch. 2.5 §§ 798-799 (1978); Colo. Rev. Stat. § 38-12-201 — § 38-12-205 (1973); Conn. Gen. Stat. § 21-79 (1979); Del. Code tit. 25, § 7003-§ 7013 (1974); Fla. Stat. Ann. § 83.750-§ 83.794 (West. Cum. Supp. 1979); Ill. Rev. Stat. ch. 57, § 2 (a) (1977); Ind. Code Ann. 16-9-2B §§ 1-39 (Burns Cum. Supp. 1979); Iowa Code Ann. § 135D.1-§ 135D.34 (West Cum. Supp. 1979); Ky. Rev. Stat. § 219.310-§ 219.991 (1977 Repl. Vol.); Me. Rev. Stat. tit. 30, § 4066-§ 4067 (1964); Mass. Gen. Laws Ann. ch. 140, § 32F-§ 32Q (West 1974); Mich. Stat. Ann. § 19.855(1)-(47) (1976); Minn. Stat. Ann. § 327.41-§ 327.47 (West 1966); Mont. Rev. Codes Ann. § 50-52-101 — § 50-52-105 (1979); Neb. Rev. Stat. § 71-4621 — § 71-4634 (1976 Reissue); Nev. Rev. Stat. § 118.280 (1973); N.H. Rev. Stat. Ann. § 205-A:3 (1977 Repl. Ed.); N.J. Stat. Ann. § 46:8C-2 (West Cum. Supp. 1979); N.M. Stat. Ann. § 67-41-1 — § 67-41-15 (1975 Repl. Vol.); N.Y. Real Prop. Law § 233 (McKinney Cum. Supp. 1979); N.C. Gen. Stat. § 342-36.1 (1977 Cum. Supp.); N.D. Cent. Code § 23-10-01 — § 23-10-12 (1978 Repl. Vol.); Ohio Rev. Code Ann. § 3733.01-§ 3733.20 (Page 1953); Or. Rev. Stat. § 91.720 (1977); Pa. Stat. Ann. tit. 68, § 398.1-§ 398.16 (Purdon Cum. Supp. 1979); Va. Code § 55-248.41 — § 55-248.48 (1979 Repl. Vol.); Wash. Rev. Code Ann. § 59.20.010-§ 59.20.900 (West Cum. Supp. 1978); Wyo. Stat. § 35-547 — § 35-556 (1975 Cum. Supp.).

**6.** 1976 Md. Laws, ch. 479 provides that this statute was enacted:

"FOR the purpose of providing for certain standards regarding mobile homes and mobile home parks; providing for disclosure of certain information; imposing limitations on leasing premises; prohibiting a gratuity which promotes discrimination; establishing restrictions on installation of certain appliances and the making of certain improvements; imposing notice requirements in certain instances; limiting collection of late payment fees; *prohibiting certain practices regarding purchases or sales of certain items, including mobile homes,* and limiting collection of certain commissions. . . ." (Emphasis added.)

*See* Davison, *An Analysis of the Maryland Mobile Home Park Act: A Need for Amendment,* 8 U. of Balt. L. Rev. 271, 272 (1979).

**7.** § 8A-103 (b) provides:

"By September 1, 1976, an owner shall offer a prospective

A park owner may adopt rules and regulations, including quality standards. § 8A-102 (a) (1).[8] He cannot, however, restrict the installation of appliances or improvements except under limited circumstances, and he cannot require that a mobile home or any of the necessary installation equipment be purchased from a particular person. §§ 8A-106, 110 (a). Moreover, he is prohibited from preventing the sale of a mobile home already in the park or requiring it to be removed upon sale. § 8A-110 (b). While the park owner may charge fees for the use of the park, he may not collect gratuities, excessive late payment fees, or unearned commissions. §§ 8A-104, 109, 110 (c). He must disclose all rules and fees to prospective residents and give all residents 30 days notice of any changes. §§ 8A-103 (a), 108. Finally, the park owner may evict only for specified reasons and after giving 30 days notice. § 8A-107 (a).[9]

The appellant, William Cross (park owner), is one of the owners of Cider Barrel Mobile Home Court (park). Before 1 July 1976, the park owner, by rule, required the residents of the park to remove mobile homes from the park if they were sold. Effective 19 August 1977, more than a year after the

---

year-round resident a written lease for a period of not less than one year."

§ 8A-105 provides:

"If a resident purchases a mobile home from another resident, an owner shall offer the resident a new written lease for the remainder of the lease then in existence, but in no event, for a period of less than one year."

8. § 8A-102 (a) (1) provides in pertinent part:

"An owner may prescribe by rule:
(1) The size, quality, or construction standards for any mobile home to be placed or retained after resale in the park. . . ."

9. § 8A-107 (a) provides:

"(a) An owner only may evict a resident for:
(1) Nonpayment of rent;
(2) Violation of a federal, State, or local law that is detrimental to the safety and welfare of other residents in the park; or
(3) Repeated violation of any rule or provision of the lease."

effective date of the Act, the park owner, by rule, required the following:

### "SECTION V MOBILE HOME STANDARDS AND RESALE REQUIREMENTS

(a) All homes to be placed or *retained after resale* in the Park must meet the following minimum standards with respect to size, quality and construction standards.

WIDTH   - 12 feet
LENGTH - 50 feet
YEAR    - *New home or current year model which contains an approval seal under the National Mobile Home Construction and Safety Standards Act.*" (Emphasis added.)

The appellees, Morris and Debra Eader, were owners of a mobile home and residents of the park (residents). On 3 November 1977, in the Circuit Court for Montgomery County, they filed a petition against the park and its owner. Five other couples, who owned mobile homes and were residents of the park, as well as the Attorney General,[10] intervened as parties plaintiff. The residents alleged that as a result of Section V (a) of the park rules (Rule V (a)), they either were unable to sell their mobile homes or were forced to sell them at substantially reduced prices because they had to be removed from the park. The residents sought declaratory and injunctive relief.

On 25 April 1979, after a trial on the merits, the trial court entered an order which, among other things, declared that the Act was constitutional on its face and as applied; that Rule V (a) of the park rules was not a quality standard within the meaning of § 8A-102 (a); and that that section,

---

10. § 8A-112 provides:
"The Division of Consumer Protection of the office of the Attorney General shall enforce this title."

except as it related to the minimum width and length of mobile homes, violated § 8A-110 (b) of the Act. The order further decreed that the park owner be enjoined from enforcing the invalid portion of Rule V (a). The order was appealed to the Court of Special Appeals and we granted a writ of certiorari before consideration by that Court. We shall affirm.

In this case, the critical provision of the Act is § 8A-110 (b) which provides:

"(b) An owner may not:
(1) Prevent a resident from selling his mobile home in the park; or
(2) Require the resident to remove the mobile home from the park because of the sale of the mobile home."

The park owner contends that the Act is unconstitutional because it effects a "taking" of his property for the private use of another. He points out that under the Act he cannot prevent a resident from selling his home in the park or require a resident to remove his mobile home upon sale. He cannot unreasonably refuse to approve a buyer and must grant at least a one year lease to all new residents. He can evict a resident only for one of the three reasons provided in § 8A-107, and he may not, he contends, terminate the landlord-tenant relationship even if he desires to change the use of the property. The park owner concludes, therefore, that the Act permanently deprives him of the right to use his land for purposes other than a mobile home park, and, in effect, gives to others a perpetual right to occupy his land. Thus, he argues, his use of his property is restricted while the value of the resident's mobile home is enhanced. He maintains that under these circumstances, his property is being "taken" for a private and not a public purpose, and concludes, therefore, that the statute unconstitutionally deprives him of his property.

The residents and the Attorney General contend that the Act's restrictions do not essentially deprive the park owner of all beneficial use of his land and do not, therefore,

constitute an unconstitutional taking. They conclude, therefore, that the park owner has not been unconstitutionally deprived of his property.

This Court has recently considered the circumstances under which regulations restricting the use of property amount to a deprivation of property without due process of law. In *Maryland-National Capital Park and Planning Commission v. Chadwick,* 286 Md. 1, 9-10, 405 A.2d 241, 245 (1979), we said:

> "A regulation which prohibits a beneficial use of private property constitutes a fair exercise of the police power if the public interest generally requires it and the regulation is reasonably necessary to achieve the public goal without being unduly oppressive upon individuals.... [W]e have recognized that a governmental action, while not rising to the status of a compensable 'taking' of property, may amount to an invalid deprivation of property rights without due process of law, *either because the purpose of the action was improper, or because the means chosen were too burdensome on the individual property owner."* (Citations omitted.) (Emphasis added.)

Legislative acts are presumed to be constitutional. If any state of facts reasonably can be conceived that would sustain the constitutionality of a statute as a valid exercise of the police power, the existence of that state of facts as a basis for the passage of the law must be assumed. A person challenging a statute has the burden of affirmatively establishing its invalidity. *Governor of Md. v. Exxon Corp.,* 279 Md. 410, 426, 370 A.2d 1102, 1111 (1977), *aff'd,* 437 U.S. 117, 134, 98 S. Ct. 2207, 2218 (1978); *Salisbury Beauty School v. State Bd. of Cosmetologists,* 268 Md. 32, 48, 49, 300 A.2d 367, 378 (1973).

Here the record shows that mobile home owners benefited from the Act to the extent that the value of a mobile home was greater if it could remain in the park after resale. However, the fact that certain private interests may benefit

from the restrictions placed upon the property of others does not establish that those restrictions are not in the public interest. *Miller v. Schoene,* 276 U.S. 272, 279, 48 S. Ct. 246, 247 (1928). Thus, the existence of a benefit to mobile home owners is insufficient, in and of itself, to establish that there are no considerations related to the public welfare by which the Act could be supported. The park owner produced no other evidence to establish that the Act had a private purpose. Under these circumstances, we find that the Act has a public, not a private purpose.

Having reached this conclusion, we must now determine whether the Act results in an unconstitutional "taking." While all government regulations affecting private property restrict the owner's use and enjoyment to some extent, not all such regulations result in a "taking" in the constitutional sense. *Chadwick,* 286 Md. at 11-12, 405 A.2d at 246. It is not enough for the owner to show that the regulations cause a diminution in value or other hardship. If they leave the owner in substantial enjoyment of the property, they do not constitute a "taking." *Exxon Corp.,* 279 Md. at 437, 370 A.2d at 1117; *Lipsitz v. Parr,* 164 Md. 222, 234, 164 A. 743, 748 (1933). Thus, regulations which restrict the use and enjoyment of property, but which nonetheless permit an existing use to continue, generally do not constitute a "taking" because they leave the owner with some beneficial use of the property. *See Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 135-36, 98 S. Ct. 2646, 2665-66 (1978); *Plant v. Board of County Comm'rs for Prince George's County,* 262 Md. 120, 124, 277 A.2d 77, 79 (1971); *Montgomery County Council v. Kacur,* 253 Md. 220, 230, 252 A.2d 832, 838 (1969). Regulations generally constitute a "taking" only if the owner affirmatively demonstrates that the restrictions imposed deprive him of essentially all beneficial use of the property. *Pitsenberger v. Pitsenberger,* 287 Md. 20, 34 , 410 A.2d 1052, 1060 (1980); *Exxon Corp.,* 279 Md. at 437, 370 A.2d at 1117; *City of Baltimore v. Borinsky,* 239 Md. 611, 622-23, 212 A.2d 508, 514-15 (1965).

Here there was evidence to show that the Act placed some restrictions on the park owner's use of his property. A park

owner could not prevent the sale of a mobile home already in the park or require it to be removed upon sale. He could not unreasonably refuse to approve a buyer, and he had to offer one year leases to all new residents. His right to evict was limited. These restrictions, however, are insufficient to show that the Act prevented him from discontinuing his operations and thereafter changing the use of his land.

There is nothing in the Act which prevents the park owner from terminating the landlord-tenant relationship by methods other than eviction. With respect to residents, the Act does not prevent a park owner from refusing to renew an expired lease, or from providing by lease or by rule for the termination of a tenancy, upon reasonable terms, should he desire to discontinue his operations and thereafter change the use of his land. Indeed, such a lease or rule would not be inconsistent with the remedial purposes of the Act. *See Palm Beach Mobile Homes, Inc. v. Strong,* 300 So. 2d 881, 888 (Fla. 1974); *Japanese Gardens Lot Renters Protective Ass'n of Clearwater, Inc. v. Japanese Gardens Mobile Estates, Inc.,* 345 So. 2d 409, 411 (Dist. Ct. App..Fla. 1977). With respect to prospective residents, there is nothing to suggest that a park owner's refusal to approve a new resident would not be "reasonable" within the meaning of § 8A-102 (b) (2) if the basis for such a refusal was a desire to discontinue the business. Thus, there is insufficient evidence to show that the park owner has been permanently deprived of his right to use his land for purposes other than a mobile home park.

Moreover, there was evidence to show that, notwithstanding the Act's restrictions, the park owner continued the operation of the park. There is no evidence to show any decrease in occupancy, loss of revenue, or interference with marketability as a result of the Act. There is nothing to indicate that the park owner wanted to change the use of his property. Indeed, the evidence shows that he desired to continue using his property for a mobile home park.

Under the present circumstances, there is insufficient evidence to show that the park owner has been deprived of essentially all beneficial use of his property. Accordingly,

the Act does not constitute an unconstitutional "taking" of private property.

This case presents two additional questions. The first is whether Rule V (a) [11] violates § 8A-110 (b) [12] of the Act.

The park owner initially contends that Rule V (a) establishes a "quality standard" permitted by § 8A-102 (a) (1). [13] Alternatively, he argues that because the Act provides criminal penalties for noncompliance, § 8A-110 (b) must be strictly construed. He maintains that while the Act prohibits him from preventing *residents* from selling homes in the park or requiring *residents* to remove them upon resale, it does not prohibit him from making rules which have the effect of requiring a *purchaser* of a mobile home located in the park to remove it. He concludes that Rule V (a) does not violate § 8A-110 (b) because it constitutes a quality standard permitted by the Act, and because it does not directly regulate the activities of residents. We do not agree.

At the trial, expert testimony was presented to show that Rule V (a)'s requirements that a mobile home have an approval seal and be a "new or current year model" constituted age standards, not quality standards. The required "approval seal" indicated that a mobile home to which it was affixed met the mandatory minimum construction standards prescribed by the Department of Housing and Urban Development (HUD). The Mobile Home Construction and Safety Standard Act, 42 U.S.C.A. § 5401-§ 5426, effective 15 June 1976, required this approval seal to be affixed to all mobile homes manufactured after 15 June 1976. However, no mobile home manufactured before 15 June 1976 could obtain the approval seal even if it met the HUD standard. Indeed, before 15 June 1976, mobile homes manufactured for sale in Maryland were required to meet standards which were essentially the same as the HUD standards, but under Rule V (a) these mobile homes could not enter the park or remain there after resale. The HUD standards were conceded to be construction standards within

11. *See* p. 577 above.
12. *See* p. 578 above
13. *See* n. 8 above.

the meaning of § 8A-102 (a) (1). However, the expert testimony presented showed that Rule V (a)'s requirement of an approval seal was not a quality standard, but rather was, in effect, an age standard because compliance depended upon the date of manufacture rather than upon the mode of construction.

In addition, the expert testimony showed that Rule V (a)'s requirement that a mobile home be a "new or current year model" was also an age standard rather than a quality standard. It was pointed out that the quality of even a new or current year model, which had complied with the HUD standards, could be affected by such things as shipping, installation and maintenance, and, therefore, that the fact that a mobile home was a "new or current year model" did not necessarily relate to its quality.

The age of a product is not necessarily indicative of its quality. *See Baum v. Segal,* 89 F. Supp. 716, 717 (D.N.J. 1950). The evidence here was sufficient to show that the requirements of Rule V (a) did not constitute a quality standard within the meaning of § 8A-102 (a) (1).

Moreover, § 8A-110 (b) cannot be construed as limited only to preventing the park owner from restricting the sale of homes by directly regulating the activities of residents. The cardinal rule of statutory construction is to ascertain and effectuate the actual intent of the Legislature. Statutes are to be construed reasonably and with reference to the purpose to be accomplished. Results that are unreasonable, illogical, or inconsistent with common sense should be avoided. *Comptroller of the Treasury v. John C. Louis Co.,* 285 Md. 527, 538-39, 404 A.2d 1045, 1052-53 (1979). *Curtis v. State,* 284 Md. 132, 149, 395 A.2d 464, 474 (1978); Even penal statutes must not be construed so as to reach unreasonable or illogical results. *State v. Fabritz,* 276 Md. 416, 422, 348 A.2d 275, 279 (1975), *cert. denied,* 425 U.S. 942, 96 S. Ct. 1680 (1976); *State v. Petrushansky,* 183 Md. 67, 70-72, 36 A.2d 533, 535-36 (1944).

Applying these principles to the instant case produces a clear result. The purpose of the Act is to protect mobile home

owners by preventing certain abusive practices. More specifically, the purpose of § 8A-110 (b) is to insure the residents' ability to sell their mobile homes unimpaired by a requirement that the homes be removed from the park if sold. Here there was evidence to show that before the passage of the Act, the park owner, by rule, required the residents to remove mobile homes if they were sold. There was also evidence to show that after the effective date of Rule V (a), no mobile home sold by a resident was permitted to remain in the park. As a result of the enforcement of the Rule, some residents were unable to sell their mobile homes while others were forced to sell them at substantially reduced prices. Thus, the enforcement of Rule V (a) permitted the park owner to do indirectly what he could not do directly, and denied residents the very protection that § 8A-110 (b) was intended to provide. Such a result is illogical and unreasonable and contrary to the purpose of the Act.

Rule V (a) does not constitute a quality standard. Moreover, it effectively prevents residents from selling their mobile homes at all or from selling them at a reasonable price. Accordingly, we now hold that Rule V (a) violates § 8A-110 (b) of the Act.

The only remaining question is whether expert testimony concerning the characterization of Rule V (a) as an age or quality standard, the availability of mobile home sites in Montgomery County, and resale prices of mobile homes in general, should have been admitted. While the opinion of an expert on a matter of law may be inadmissible, see *Franceschina v. Hope*, 267 Md. 632, 642, 298 A.2d 400, 406 (1973), the opinion of an expert, even on the ultimate issue of fact, is admissible if it is relevant and will aid the trier of fact. *Andrews v. Andrews*, 242 Md. 143, 153, 218 A.2d 194, 200 (1966); *Shivers v. Carnaggio*, 223 Md. 585, 588-91, 165 A.2d 898, 900-01 (1960). The expert opinions expressed here were related to matters of fact and not to questions of law. This testimony was relevant and helpful to the trier of fact. It was therefore admissible.

I am authorized to state that Judge Smith concurs in the result.

*Judgment affirmed.*
*Costs to be paid by appellants.*