474 A.2d 229

**Louis H. COHEN**

v.

**Louis L. GOLDSTEIN, et al.**

**No. 561, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

May 4, 1984.

Joseph J. D'Erasmo, Rockville, for appellant.

Carol S. Sugar, Asst. Atty. Gen., with whom was Stephen H. Sachs, Atty. Gen., on the brief, for appellees.

Argued before WILNER, GARRITY and BLOOM, JJ.

WILNER, Judge.

The question presented by this appeal is whether a full-time master in chancery may earn credit in the judicial pension plan for continued employment as a master after his seventieth birthday. This question is of particular importance to appellant, Louis H. Cohen, for, if he is able to earn service credit in the plan for the six months between his seventieth birthday on January 14, 1982, and his actual retirement on July 14, 1982, he will be entitled not only to that six months but, by virtue of Md.Code Ann. art. 65, § 88, to an additional three years and eight months by reason of active military service during World War II.

Unfortunately for Mr. Cohen, we do not believe that he is entitled to earn credit in the plan beyond his seventieth birthday, and we shall therefore affirm the judgment of the Circuit Court for Montgomery County to that effect.

## The Facts

The underlying facts are simple and largely undisputed. Appellant was appointed by the judges of the Circuit Court for Montgomery County as a full-time domestic relations master on June 27, 1972. He was then sixty years and five months of age.

At the time, as we shall see, full-time masters were eligible to join either the retirement system operated by the county in which they served or, with the county's consent, the State Employees' Retirement System (SERS). The record does not indicate whether appellant joined either the Montgomery County retirement plan or SERS. As of July 1, 1975, by act of the General Assembly, full-time masters were required to join the contributory pension plan for judges (Md.Code Ann. art. 73B, §§ 55–57), and appellant, consequently, became a member of that plan as of then. As permitted by the law (§ 57(*o*)), appellant purchased retroactive credit in the judicial pension plan for his three years of service from his appointment in June, 1972, to July 1, 1975.

No doubt aware that he would be some five months shy of ten years of creditable service in the plan upon reaching his seventieth birthday, and would thus be ineligible as of then for the military service credit available under art. 65, § 88, shortly before reaching seventy, appellant contacted an assistant attorney general to inquire as to whether he could continue to contribute and earn credit in the plan after his seventieth birthday. By virtue of a "grandfather" clause in an order of the Court of Appeals dated October 1, 1980, he assumed that he had the right to continue his employment as a master beyond age seventy. He was advised, however, that despite his apparent ability to continue serving as a master, once he reached age seventy he could no longer contribute to or earn service credit in the judicial pension plan.

Notwithstanding that advice, appellant, with the concurrence of the judges of the Circuit Court, continued in his employment until July 14, 1982, and, for reasons not entire-

ly clear considering the advice given by the Attorney General, contributions to the plan continued to be deducted automatically from his paychecks. On April 1, 1982, he formally applied for three years, eight months, fourteen days of military service credit, claiming by virtue of actual service and accumulated unused sick leave the ten years of creditable service required by art. 65, § 88. This request was renewed upon his actual retirement, at which point he claimed an entitlement to fourteen years, two months of creditable service (ten years, nine days actual service, three years, eight months, fourteen days military service, and five months accumulated sick leave). The trustees of the pension system rejected that claim, and calculated his credit as of his seventieth birthday. That gave him nine years and seven months of creditable service.

Aggrieved, appellant filed an action in the Circuit Court for Montgomery County seeking a declaratory judgment that he was entitled to the fourteen years, two months of credit claimed by him. The court declared otherwise, however, and thus we have this appeal. The defendants below and appellees here are the appropriate officials of the judicial pension plan.

## The Dispute

Appellant's argument is simple and direct. There is nothing in the law, says he, that required him to retire at age seventy. He is not subject to the constitutional provision (Md. Constitution, art. IV, § 3) requiring *judges* to retire at age seventy, because for constitutional purposes he is not a judge. Although the pension law (art. 73B, § 55(m)) defines "termination of service" for pension purposes, it does not of itself require a member to retire at any particular time, and certainly not at age seventy. And, he notes, while the Court of Appeals, by order of October 1, 1980, directed that masters retire at age seventy, that order exempted persons then serving as masters, and therefore did not apply to him. The only limitation on his right to continue contributions to the judicial pension plan is ex-

pressed in § 57 of art. 73B, namely, that a member shall contribute for sixteen years but not thereafter. The sum and substance of his argument, then, is that he was entitled to continue making contributions, and thus to earn additional credit in the plan until he either ceased active service as a master or made contributions for sixteen years.

Appellees' response, which was accepted by the Circuit Court, is that the obligation of a master to retire at age seventy is at least implicit in the law—that the General Assembly never intended when it placed masters in the judicial pension plan for masters to have greater rights therein than judges. Consistent with that approach, appellees view the provision in § 57(b)(1) of art. 73B that a judge shall contribute to the fund "until he has served as a judge for 16 years" and "shall make no contributions thereafter" not as an entitlement to contribute for up to sixteen years, even after reaching seventy, but rather as a cut-off of contributions when the sixteen years is attained *prior to* reaching seventy.

We believe that response to be a correct one; but to understand why it is correct, we need to examine in some detail the legislative history of the three statutes—the judicial pension law, the "military credit" law, and the law placing masters in the judicial pension—that are involved here.

## Discussion

■ Masters in chancery, such as appellant, were and still are appointed by the judges of the respective circuit courts. (Md.Code Ann. Cts. & Jud.Pr. art., § 2–501; Md.Rule 596.) They are not, and never have been, State employees. They are not paid by the State, and other than their formerly optional ability to join SERS and their current inclusion in the judicial pension plan, they receive no direct benefits from the State. They are "at will" appointees of the circuit court and receive their compensation from either the fees they are permitted to charge or through the local government budget.

Prior to 1969, judges of the circuit and appellate courts belonged to a non-contributory retirement plan. After "the termination of active service" and upon reaching the age of sixty, such a judge was entitled to an annual retirement benefit equal to a fixed sum ($750 for circuit court judges, $800 for Court of Special Appeals judges, $850 for Court of Appeals judges) times the number of years, up to sixteen, of active service as a judge.

In 1969, the Legislature adopted a new, contributory judicial pension plan which all judges appointed after June 30, 1969 had to join. Judges then in office could elect to join the new plan or to remain in the old one. The new plan required each judge to contribute an amount equal to six percent of his annual compensation, apparently for as long as he remained in active service as a judge. There was no provision in the 1969 enactment authorizing the cessation of contributions after sixteen, or any other number of, years. Upon "termination of active service" and upon reaching age sixty, the judge was entitled to receive "an amount equal to sixty per centum of his maximum salary or one-sixteenth ($\frac{1}{16}$) of that amount for each year of service if he served for less than sixteen years." *See* 1969 Md.Laws, ch. 612, adding § 49I to Md.Code Ann. art. 26 (1966 Repl.Vol. and 1968 Suppl.).

The ink was hardly dry on this new plan before the Legislature began tinkering with it. In 1970, among other things, it corrected the open-endedness of the required contributions to the plan by providing that "[i]n no event shall any judge make the contributions provided for by this subsection [*i.e.,* § 49(i)(4)] for more than sixteen years." 1970 Md.Laws, ch. 459. In 1971, it provided for cost-of-living adjustments to benefits under all of the State retirement systems, including the judicial pension plan. 1971 Md.Laws, ch. 424. In 1972, it permitted judges otherwise eligible, upon retirement, to draw benefits from both the judicial and the State employees' retirement systems. 1972 Md.Laws, ch. 382. In 1973, it exempted retired judges who

were seventy years or older and who drew pensions of $3,500 or less from the ban on practicing law while receiving the pension.[1]

Finally, in 1974, in response to a recommendation included in the February 1974 Interim Report of the Commission on Judicial Reform, the Legislature rewrote the judicial pension law. It kept in existence the pre-1969 non-contributory plan and permitted those judges who were members of it to remain so at their option, but the thrust of the new law was to improve the contributory plan sufficiently to encourage judges in the old plan to switch to the new one. *See* Interim Report, pp. 30–37. To that end, it greatly increased the level of benefits available under the contributory plan. The 1969 plan, as noted, pegged a judge's benefits to sixty percent of his highest salary as a judge, subject to annual cost-of-living adjustments. The 1974 plan pegs the benefits to two-thirds of the current salary paid to a judge holding the same level judicial position (*i.e.*, serving on the same level of court) as the retiree held at the time his service terminated.

The significance of pegging pension benefits to current salaries, especially at the higher percentage rate, is now and was then readily apparent in light of the facts that (1) constitutionally a judge's salary cannot be reduced during his term of office (Md. Const., Art. IV, §§ 14, 24, 41H) and (2) by virtue of 1972 Md.Laws, ch. 343 (now Md.Code Ann., Cts. & Jud.Pr. art., § 1–703), judges receive at least the same percentage increase in salary as is given to classified State employees.

As the *quid pro quo* for this formula increase in benefits, the General Assembly made three other changes in the system: (1) it did away with the annual cost-of-living adjust-

---

1. At the time, § 49(e) of art. 26 provided that a judge who retires and accepts the pension provided in § 49 "shall not *during the period of such acceptance* engage in the practice of law." (Emphasis supplied.)

ments;[2] (2) it prohibited any local supplement to a judge's pension;[3] and (3) it flatly prohibited a judge from practicing law not only during the period he receives pension benefits but at any time after receiving such benefits.[4]

With those exceptions, the new law, though reorganized, was essentially the same as the one it replaced. The sixteen-year limit on a judge's contribution, first enacted in 1970, was retained, as were the conditions on when the judge could begin drawing the pension. Under both the 1969 and the 1974 plans, absent retirement for disability, the judge was not entitled to receive benefits until he reached sixty, and he retained the option upon retirement to withdraw his contributions and forgo the pension benefits.

The 1969 law set out the plan without resorting to defined terms. No "definitions" appeared in § 49. In writing the 1974 law, the General Assembly, following the Commission's suggestion, decided to define a number of terms— twelve, to be exact. One of them, § 55(m), was "termination of service." For purposes of the contributory plan, the term appears in §§ 56 and 57 in two contexts: (1) as a basing point for determining *when* a judge is eligible to receive the pension benefits, *i.e.*, "after termination of his service" (§ 56(a)), and (2) as a reference point in regard to the *amount* of benefit he is to receive—two-thirds of the salary of a judge serving on the same level court as the

**2.** It is important to keep in mind that the extraordinary inflation of the late 1970's had not become manifest in 1974, and so, at the time, the cost-of-living adjustments were not expected to produce significant escalations in pension benefits.

**3.** Prior law permitted local supplementation provided that the pension benefit, as supplemented, did not exceed $20,000. *See* art. 26, § 49(i)(5), 1973 Repl.Vol.

**4.** That provision was not recommended by the Commission, but was added by the Legislature. It was declared unconstitutional in *Attorney General v. Waldron*, 289 Md. 683, 426 A.2d 929 (1981). At least until the decision of the circuit court in *Waldron*, which was affirmed by the Court of Appeals, the prohibition was thought to be valid and was generally respected.

retiree served "at the time of the termination of his service." (§ 57(h)). It has no other direct significance. It does not state when a judge *must* terminate his service, or even when he *may* do so. It merely defines what acts will, for pension purposes, constitute a termination of service. One of these acts, of course, is the mandatory retirement at age seventy. (§ 55(m)(1)).

But that, which is regarded as critical by appellant, merely begs the question. The fact is that when the 1974 law was enacted, judges had to retire at age seventy, and there was no provision for recalling them even for temporary service.[5] *There could be no question then of a judge contributing to the pension plan or attaining creditable service therein after reaching the age of seventy; it simply was not possible, and the Legislature knew that to be the case. Cf.* 59 Op. Att'y Gen. 627 (1974).

This 1974 law, now codified as §§ 55–57 of art. 73B, is the first of the relevant statutes. The second was also born in 1974, as an addition to the Militia law.

In 1941, the Legislature enacted a law "providing for the re-employment of persons in active military service [and] the protection of their seniority[,] pension and merit system rights...." 1941 Md.Laws, ch. 676. It was to protect State employees who were inducted into the armed service pursuant to the Selective Training and Service Act of 1940, and provided essentially that if such persons applied for re-employment by the State within forty days after discharge from military service, they were to be restored to "a position of like seniority, status and pay ... just as though [their] employment had not been interrupted." It provided further that the employee's rights in any pension plan "shall not be destroyed or impaired by reason of his absence in such military service, or his failure to contribute to such fund or system while he is in said military service." How-

---

5. The General Assembly did not authorize the temporary recall of retired judges until 1977. *See* 1977 Md.Laws, ch. 899 (Md.Code Ann., Cts. & Jud.Pr. art., § 1–302).

ever, the employee would get no credit for that time except to the extent that he, or someone on his behalf, actually made the contribution. Subject to appropriations, the State was authorized to make up to one year's contribution on behalf of the employee during his period of military service.

Over the years, that original 1941 Act was amended a number of times. As of 1973, it provided, in relevant part, that a member of any State or local retirement system who enlisted in the armed forces of the United States would retain his status in that system *provided* (1) he did not withdraw his accumulated contributions, (2) within one year from the time he was relieved of active duty he became "actively employed" by the State or a political subdivision, (3) he did not, in the meanwhile, accept other permanent employment, (4) he reapplied for credit in the retirement system of which he was a member, and (5) if he did withdraw any part of his accumulated contributions, he repaid the amount withdrawn with interest. If those conditions were satisfied, the member was entitled to receive "credit as membership service for the period of his absence" up to five years. *See* Md.Code Ann. art. 65, § 88.

By 1974 Md.Laws, ch. 622, the General Assembly amended the statute (§ 88 of art. 65) to provide that "[n]otwithstanding any other provision of this section [or] Article 73B ... credit for military service shall be granted to any member of a State retirement fund or system ... who has *not* met the [aforementioned five conditions] upon the attainment by any member of ten years of creditable service", up to five years and subject to certain limitations. (Emphasis supplied.) The effect of this amendment, of course, was to give *free* credit for time (up to five years) spent in military service upon the attainment of ten years of "creditable service" without regard to whether the employee complied with any of the five statutory conditions.[6] Judges

---

6. The law went on to provide that the State or another employing agency "shall make all necessary contributions to the pension and annuity funds for the funding of military service credit upon the

who joined the contributory judicial pension plan were declared eligible for the credit afforded by ch. 622. *See* 59 Op. Att'y Gen. 627, 633–35 (1974).

■ By reason of ch. 483 and 622, as of July 1, 1974, a judge, after ten years of creditable service in the contributory judicial pension plan and without additional contribution on his part, became eligible to receive credit for any time, up to five years, that he had spent in active military service. The qualifying ten years, however, had to be earned before the judge reached seventy, for, as noted, it could not be earned thereafter. Thus, in simple terms, a judge appointed to the bench after his sixtieth birthday could not, and cannot, be eligible for the "military credit" provided under ch. 622.

We turn now to the third statute—the 1975 enactment putting full-time masters under the contributory judicial pension plan.[7] The statute is a simple one; it expands the definition of "judge" in § 55(f) to include a full-time master "subject to the benefits and limitations of paragraphs (1) through (9) of subsection (m) of this section."

Prior to 1972, masters had a somewhat uncertain status with respect to retirement benefits. At one point, it seems that they were eligible as "appointed or elected officials" for participation in SERS under art. 73B, §§ 1(3), 3(1), and 3(5). *See* 44 Op. Att'y Gen. 157 (1959).[8] Nine years later,

---

attainment of ten years of creditable service by any member so entitled to the credit."

7. That enactment, HB 1098, was one of two bills passed on this subject by the 1975 Legislature. SB 932 would have included only masters in Prince George's County in the judicial pension plan. It was vetoed in favor of the more general HB 1098. *See* 1975 Md.Laws, pp. 3968–69.

8. Prior to 1978, art. 73B, § 3(1) required an "employee as herein defined" to become a member of SERS. Section 1(3) defined "employee" as including "any appointed or elected employee of the State" other than judges, certain other classes of officials, and employees "who are serving on a temporary basis." Section 3(5) exempted from the mandatory membership requirement of § 3(1) "officials elected or appointed." The Attorney General was asked specifically whether a

however, the Attorney General opined that such masters were *not* appointed officials and therefore were *not* eligible for optional participation in SERS. 53 Op. Att'y Gen. 522 (1968). In 1972, the General Assembly expressly gave full-time masters appointed in the counties the option of joining either the local retirement system maintained by the county in which they served or, with the approval of the county government, SERS. 1972 Md.Laws, ch. 430. A year later, this benefit was specifically extended to masters in Baltimore City, there apparently having been some question as to whether they were included in the 1972 enactment. *See* 1973 Md.Laws, ch. 370.

The method chosen by the Legislature to achieve this result is significant. At the time, based on the 1968 Opinion of the Attorney General, masters were not regarded as appointed officials for purposes of § 1(3) or § 3(5). The Legislature could, of course, have provided for optional participation in SERS by simply declaring them to be such officials, but it did not do so. Rather, in a new § 22A to art. 73B, it accorded the option to them as *masters*, the implication being that the General Assembly did not choose to regard them as appointed officials for purposes of SERS. The condition imposed, of local government approval, supports that implication; they were not in the same category as appointed officials under §§ 1 and 3, who did not need anyone's approval to join SERS.

■ This becomes important because of art. 73B, § 11(1)(b). There is no counterpart to the mandatory retirement provision of Art. IV, § 3 in the State personnel law. Insofar as the merit system law (Md.Code Ann. art. 64A) is concerned, State employees are not subject to mandatory retirement because of age. There *is* such a requirement in

---

master for juvenile causes in Prince George's County qualified as an appointed official under § 3(5) and was thus eligible for optional participation in SERS. The Attorney General concluded that the master was such an official and therefore was eligible for optional participation.

the SERS law, however. Section 11(1)(b) of art. 73B provides that "[a]ny member in service *who is not an elected or appointed official of the State and who has attained the age of seventy shall be retired forthwith or on the first day of the next calendar month.*" (Emphasis supplied.) Until 1974, there was no exception to that requirement.

In 1974, the Legislature amended § 11(1)(b) to permit SERS members to continue their employment beyond age seventy on an annual basis subject to approval by their "department head." 1974 Md.Laws, ch. 720. A careful review of that amendment, however, indicates that it did not apply to masters. The Act required a member desiring to continue his employment to submit an application to his "department head" on a form supplied by the Secretary of Personnel. That obviously has no relevance to a master. Moreover, the title to the Act, which, under Art. III, § 29 of the State Constitution controls its reach, stated the purpose of the Act as permitting members of SERS over a certain age "to continue to be employed *by the State.*" (Emphasis supplied.) Masters, as noted, were not and are not employed by the State.

It thus seems clear that, notwithstanding the 1974 amendment to § 11(1)(b), unless a master qualified as an "appointed official of the State", if he were a participant in SERS for pension purposes he had to retire at age seventy, whether or not the judges for whom he worked actually permitted him to serve longer. Whatever the Attorney General's 1959 belief as to whether a master was an "appointed official", by 1975, it was certain that he did not have such status. The 1959 opinion, which, as noted, involved a master in juvenile causes, was premised on the assumption that "it is the responsibility of the Master to not only hear cases coming before the juvenile division of that Court, *but to actually make determinations as to guilt or innocence.*" (Emphasis supplied.) That, of course, was a judicial function, and, as judges were State officials, "it necessarily follows that the Master for Juvenile Causes, being a

direct arm of the Circuit Court, would come under the category of an official of the State." 44 Op. Att'y Gen. at 158.

That notion was wiped away in *Matter of Anderson*, 272 Md. 85, 321 A.2d 516, *appeal dismissed* 419 U.S. 809, 95 S.Ct. 21, 42 L.Ed.2d 35 (1974), *cert. denied* 421 U.S. 1000, 95 S.Ct. 2399, 44 L.Ed.2d 667 (1975), where the Court announced unequivocally that masters are *not* empowered to decide cases, but only to make recommendations to a judge. They are entrusted "with no part of the judicial power of. this State." *Id.* at 106, 321 A.2d 516. A master, said the Court, "is a ministerial officer, and not a judicial officer." *Id.*

It seems clear, then, that at least after the filing of *Matter of Anderson* in June, 1974, masters who were members of SERS did not have the status of appointed officials, and were therefore subject to the mandatory retirement provision of § 11(1)(b) of art. 73B. They too, then, were legally ineligible for the military credit unless they attained ten years of creditable service in the retirement system *prior to their seventieth birthday.* Whatever may have been their *actual* ability to continue serving after reaching the age of seventy, *i.e.,* by sufferance of the judges who appointed them, for purposes of SERS they should have been regarded as retired as of the first day of the month following their seventieth birthday.[9]

As *Matter of Anderson* and its necessary implications were presumably known to the General Assembly, its

9. The record before us does not reveal how many full-time masters, if any, have *ever* served beyond age seventy, or how many, if any, remained in the various local retirement systems, or whether those retirement systems had mandatory retirement provisions similar to § 11(1)(b) of art. 73B. The Montgomery County system did have such a provision. Subject to one-year extensions that could be granted by the chief administrative officer, a county employee had to retire at age sixty-five. *See* Montgomery County Code (1973), §§ 33–38. Whether that extension provision applied to masters, who, as noted, were not generally subject to the county personnel law, is not clear.

enactment of 1975 Md.Laws, ch. 869 must be viewed in light of such presumed knowledge. The critical question then is whether under any rational hypothesis the General Assembly could possibly have intended to confer on these ministerial employees of the court a benefit that neither they nor the judges then enjoyed. We think not. The judicial pension system was created for judges. The benefits are generous, to be sure; but it is all subject to the one clear undisputed limitation that a judge may not acquire creditable service after age seventy. We simply cannot believe that the Legislature ever intended to waive that limitation for masters.

There are many rules of statutory construction; almost like Newton's law, for each one suggesting one result there seems to be another of equal stature suggesting an opposite result. As noted in *State v. Petrushansky*, 183 Md. 67, 71, 36 A.2d 533 (1944), however, "It is not judicial legislation for courts to construe acts according to their obvious intent and meaning, considering the purpose of their enactment. That is one of the cardinal rules of construction of statutes. *Real intent must prevail over literal intent.*" (Emphasis supplied.)

The *Petrushansky* Court was also faced with a literal reading of a statute that would produce an absurd result. It refused to read the statute in that manner, stating at p. 72, 36 A.2d 533: "To assume that the Legislature intended such a result as this *without declaring it in very definite words* would be to reach a conclusion which is repugnant to common sense, and which would attribute to the legislative mind something which there is no reason to suppose it contemplated." (Emphasis supplied.)

■ This is not a novel doctrine. It is but one emanation of the general principle that "[s]tatutes are to be construed reasonably and with reference to the purpose to be accomplished. Results that are unreasonable, illogical, or inconsistent with common sense should be avoided." *Cider Barrel Mobile Homes v. Eader*, 287 Md. 571, 583, 414 A.2d

1246 (1980); *compare Clark v. Tawes*, 187 Md. 195, 49 A.2d 463 (1946).

 Appellant, as noted, argues that because § 55(m) does not, of itself, require judges or masters to retire at age seventy, and because masters are not subject to Art. IV, § 3 of the State Constitution, to the extent permitted by the "grandfather" clause in the October, 1980 order amending Md.Rule 596, masters may continue to acquire creditable service in the judicial pension plan after reaching seventy. We would read subsection (m) more broadly, as expressing a legislative recognition that creditable service must terminate at age seventy if it has not terminated sooner. Masters were subject to that limitation before, and, in our judgment, they are subject to it now. That, clearly, was the real intent of the Legislature. It is implicit not only from the legislative history of these various enactments, but also from the subsequent refusal of the General Assembly to enact proffered legislation that would have expressly permitted appellant to do what he now seeks. In 1980, two senators from appellant's county introduced SB 68, *by request*, to amend the military credit law (art. 65, § 88) to provide that

> "any member who would be otherwise unable to attain 10 years of creditable service due to reaching mandatory retirement age shall be permitted to extend his employment up to an additional 6 months past the mandatory retirement age if that additional service will permit the attainment of military service credit under this section.

The bill did not pass.

In 1981, the two senators put in another bill (SB 70), also amending § 88, to provide that

> "any member required to retire at 70 years of age who has attained 69 years and 6 months of age and has more than 9 but less than 10 years of creditable service, upon termination of service, shall receive credit for military

service not to exceed a maximum of 4 years of creditable service."

That bill also did not pass.

We cannot, of course, tell with certainty how many persons other than appellant would have benefited from either of those bills. Their scope, to say the least, was exceedingly narrow.[10] The point is that they would have amended the law expressly to permit appellant to achieve the military credit that he now seeks, and the Legislature would have none of it. Although we would not presume to infer a legislative intent solely from the failure of a bill, the failure of these two bills, coupled with the overall legislative history described above, reinforces our firm belief that the Legislature did not intend for appellant, or any other master, to accrue service in the judicial pension plan after his seventieth birthday. The Court of Appeals *may* by its October, 1980 order, have permitted appellant to serve beyond the age of seventy; but that order cannot enlarge his rights under the statutory pension plan.[11]

---

**10.** The fiscal note rendered by the Department of Fiscal Services with respect to SB 68 estimated that it might apply to a total of ten employees per year in all of the State retirement plans, including the one for teachers. Significantly, the fiscal note also made the point that as State employees were eligible to extend their employment beyond age seventy under the 1974 amendment to SERS, SB 68 might have little effect on them, but that members of the judicial pension plan could *not* seek approval to work beyond age seventy.

**11.** Appellant, as we noted, assumed that his continued service beyond age seventy was authorized by the "grandfather" clause in the Court's order, an assumption not challenged by appellees. We observe, however, that when the amendment to Md.Rule 596 was being discussed and drafted by the Court's Standing Committee on Rules of Practice and Procedure, the point was made by Delegate Joseph Owens, a member of the Committee, that a "grandfather" clause permitting currently employed masters to serve beyond age seventy "might conflict with the statutes setting forth mandatory retirement ages. Such a provision might allow persons to serve longer than the statute would." Minutes of June 22, 1979, agenda item 10. Presumably to guard against such a possibility, a caveat was placed in the "grandfather" clause. The general order stated that it did not apply to "a person serving as a Standing Master on the effective date of this Order *whose length of service was not subject to a limitation based upon age prior to*

For these reasons, we affirm the judgment of the Circuit Court.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

BLOOM, Judge, dissenting.

I must respectfully dissent from the conclusion reached by the panel majority.

The majority concludes that the legislature did not intend, when it added masters to the judicial pension plan, to provide them with greater benefits than those enjoyed by judges. With that conclusion I wholeheartedly agree. But the conclusion that the legislature did not intend that result does not warrant a conclusion that it specifically intended the opposite or some other result. It seems obvious to me that the legislature, when it added masters to the judicial pension system in 1975, simply did not consider the possibility that a master could continue to serve in that capacity after age seventy.

That possibility certainly existed, despite the majority's suggestions to the contrary. As of the legislative session of 1975, there was nothing (except, possibly, local rules or ordinances over which the legislature had no control) that would prevent a master from continuing to work after attaining age seventy. Masters were not subject to the constitutional provision that judges must retire at age seventy; the Court of Appeals had not adopted Rule 596 b 3 to provide that "[n]o person may serve as a Standing Master upon reaching the age of 70 years." The majority refers to § 11(1)(b) of art. 73B as a mandatory retirement provision for members of the State Employees Retirement System

---

*this Order."* (Emphasis supplied.) If, as Delegate Owens suggested and as we believe to be the case, masters were subject to mandatory retirement at age seventy under the judicial pension law, the "grandfather" clause may well be nugatory. The Court need not decide that question in this case.

but ignores two facts that make such reference meaningless to this case:

(1) Not all masters were members of SERS. As the majority pointed out, membership in SERS was not mandatory; a master might opt to remain in a local pension system.

(2) Upon the effective date of the statute bringing masters into the judicial pension system, those masters who had been members of SERS and thus subject to art. 73B, § 11(1)(b) were removed from that system and that statutory provision.

The majority refers to the failure of the legislature to enact SB 68 in 1980 and SB 70 in 1981 as indicative of legislative intent. It would certainly appear that the members of the General Assembly during the legislative sessions of 1980 and 1981 had no intention of tinkering with the military credit law (art. 65, § 88) for the specific benefit of Mr. Cohen. What other legislative intent can be inferred from the failure to enact those bills is problematical. The motives that prompt the various members of a legislature to embark upon a particular course of action may be varied and conflicting. *See* 2A Sutherland, *Statutes and Statutory Construction,* § 48.17 (Sands 3d ed. rev. 1973). In any event, we are concerned with the intent of those legislators who constituted the General Assembly of 1975, not those who were members of the General Assembly during the 1980 and 1981 sessions.

The majority cites *State v. Petrushansky,* 183 Md. 67, 36 A.2d 533 (1944), as authority for the proposition that in construing legislation, "real intent must prevail over literal intent." I cannot quarrel with that. Certainly, a statute should not be construed in a manner "repugnant to common sense," *id.* at 72, 36 A.2d 533, or in such a manner as would lead to an absurd result. But what if each of two possible constructions of a statute would be contrary to the apparent intent of the legislature? I suggest that in such event we should so construe the statute as to do least violence to the

essential intent of the entire legislative scheme of which the specific statute is a part.

As of July 1, 1975, the effective date of the statute bringing masters into the judicial pension system, it was entirely possible for a master to continue serving as such beyond age seventy. If such a master reached the age of seventy and did not cease working, there were two possibilities: (1) He could continue to contribute to the judicial pension fund until he acquired the maximum benefits after sixteen years of service (including any military credits to which he might be entitled under art. 65, § 88) or (2) it could be deemed that his service terminated, *i.e.*, that he was retired, for purposes of the judicial pension plan, at age seventy even if he continued working until age eighty. The majority says we must choose the second alternative because the first one was not intended by the legislature. But it is clear that when a person is retired for purposes of the judicial pension fund, he becomes entitled to receive his pension. Art. 73B, § 56. What then would happen to our hypothetical master under alternative No. 2? He would receive both his salary as an active master and his pension as a retired master at the same time. That result, I suggest, would be much more contrary to the entire scheme and purpose of the judicial pension plan than would merely permitting a master to continue to pay into the plan if he kept working beyond age seventy.

For that reason, I would reverse the judgment and remand for the entry of a decree declaring that Mr. Cohen is entitled to retirement benefits based on ten years and nine days of employment service plus three years, eight months and fourteen days of military service.